ISRAEL G. WHITNEY & others *vs.* THOMAS THACHER & another.

Suffolk. March 19. — May 8, 1875. AMES & ENDICOTT, JJ., absent.

Two hundred and fifty bales of gunny bags were sold by a written contract, to arrive by a certain ship, and " to average 440 lbs. gross per bale or no sale, buyer's option; to be decided on receipt of invoice at 11½ cents per bag gold in bond cash." The bales averaged about 450 lbs., and all were over 440 lbs. *Held,* that the provision of the contract as to average weight was a warranty only against deficiency in weight, and that the contract was not voidable on account of the excess.

In an action to recover damages for a refusal to accept goods sold under a written contract, to arrive at New York, and the price of which at the time of the refusal was less than the contract price, merchandise brokers in Boston, members of firms doing business and having houses established in Boston and New York, who are familiar with the market value of such goods in New York, and whose information is derived from the daily price current lists and returns of sales daily furnished them in Boston from their New York houses, may testify to such value in the New York market at the time of the refusal.

Where an article of imported merchandise of recognized uniform character is constantly bought and sold in a market regularly attended by buyers and sellers, an offer, as well as a sale, quoted in currency, " duty paid by the seller," upon the daily price current lists of that market, is admissible in evidence upon the question what was the market value of the article on a particular date in gold and in bond.

CONTRACT upon the following agreement in writing, signed by J. C. Rogers & Co., merchandise brokers :

' Boston, Feb. 9, 1872. Sold to Messrs. Thacher & Co., for account of Messrs. I. G. Whitney & Co., 250 bales gunny bags to arrive at New York or Brooklyn from Calcutta per ship British Monarch, and to average by invoice 440 lbs. gross per bale or no sale, buyer's option. To be decided on receipt of invoice at 11½ cents per bag gold in bond cash. To be of merchantable quality and deliverable sound and in good order from ship. It is guaranteed by sellers that duty on above bags shall not exceed

two cents per lb. gold under present tariff." The contract was accepted by the defendants in writing across its face.

At the trial in the Superior Court, before *Bacon*, J., it was admitted that the defendants entered into the contract with the plaintiffs through J. C. Rogers & Co., merchandise brokers, of New York; that the ship British Monarch, with the 250 bales of gunny bags on board, consigned to the plaintiffs, arrived in New York on June 4, 1872; that the plaintiffs thereupon entered the merchandise at the custom-house, and procured the usual permit to land the goods, and sent an order on the ship for their delivery to the defendants, and procured the same to be landed and placed in a bonded warehouse, and took out a warehouse receipt in the defendants' names and delivered the same to the defendants, and that the duty on said merchandise did not exceed the rate named in the contract; that all this was done in accordance with the custom of merchants in the port of New York applicable to sales of this nature, and the whole completed and the warehouse receipt delivered on or before June 7.

The bill was presented to the first named defendant, who desired further time, as he was going out of town. The plaintiffs did not assent to this, and in his absence procured from the defendant firm the storage receipt and an order on the warehouse for the goods, which order was sent to the warehouse. At the same time, a note was written to the first named defendant, saying that when he returned he could take up the storage receipt and pay the bill. On the return of the first named defendant, he refused to have anything more to do with the matter.

There was evidence tending to show that the average invoice weight of the bales exceeded 440 pounds per bale, and averaged about 450 pounds per bale. The defendants contended that the plaintiffs must show a tender of goods corresponding with those described in the contract, or something which would excuse them from making such tender.

Upon the question of damages, the plaintiffs introduced testimony to show that the true market value of the bags in gold in bond at the time of the defendants' refusal to pay the bill on June 20, and also on June 27, when they refused to comply with the contract, was from 3 to $3\frac{1}{2}$ cents gold per bag less than the contract price. And this they claimed as the measure of dam

ages. Among the other witnesses to this point the plaintiffs called two witnesses, who both testified that they were, and for seven or eight years last past had been, merchandise brokers in Boston, and members of firms which had houses established in Boston and New York, and that they were conversant with the market value of sales of gunny bags in the New York market during said time from daily price current lists and returns of sales daily furnished them in Boston from their New York houses; whereupon the defendants' counsel objected to their competency as witnesses to testify to the market value of gunny bags in the New York market at the time aforesaid; but the judge permitted them to testify.

These witnesses testified that there were no actual sales of gunny bags in the New York market during the month of June, 1872; but the price for which they were offered was 14 cents per bag in currency, duty paid by the seller, which, taking the then price of gold at 114 currency, would make the value of gunny bags at that time from 8 to 8½ cents per bag gold in bond cash. To this evidence the defendants' counsel objected, but the judge admitted it.

The defendant requested the following among other instructions: 1. The plaintiff must show a tender of goods which correspond in weight with those specified. If these averaged more than 440 pounds per bale, the plaintiffs cannot recover. 2. There is no evidence of the value of similar goods, in bond and for gold, therefore the damages must be nominal. The judge refused to give these instructions.

Instructions were also requested on the question whether the contract had been rescinded. The judge instructed the jury that it was a question of fact whether the parties intended to rescind the contract. Exceptions were taken to the refusals to give the instructions requested on this point, which were waived at the hearing in this court.

On the other question at issue, the judge instructed the jury as follows: "The language of the contract is ' to average by invoice 440 pounds.' This means that it was to average 440 pounds, but not that it shall exactly average that amount. I suppose that it might be impossible to fulfil a contract with regard to a large number of bales of goods like these, and make the aver-

age exactly 440 pounds. But the contract means that they shall at least average 440 pounds, and without any unreasonable excess of that amount. It would not do to put in bales that weighed 10,000 each, perhaps. But it appears by the invoice that the bales in this case average not quite 450 pounds. I instruct you that that is not such an excess as will avoid the contract. If you find a breach of the contract, the damages will be the difference between the price named in this contract, which is 11½ cents in gold, and the fair market value in gold; and this contract being a contract payable in gold, you will return your verdict in gold, and so specify in your verdict, whatever sum you name."

The jury returned a verdict for the plaintiffs; and the defendants alleged exceptions.

*R. D. Smith*, for the defendants.

*E. D. Sohier & H. H. Currier*, for the plaintiffs.

WELLS, J. The only question upon the instructions, which has been pressed in argument here, is that arising upon the provision, in the written memorandum of sale, in these words: "To average by invoice 440 pounds gross per bale or no sale." The ten bales first weighed averaged about 450 pounds, and all were over 440 pounds in weight. The defendants asked for instructions that if the goods averaged more than 440 pounds per bale, the plaintiffs could not recover. This was refused, and the jury were instructed that such an excess as that named would not enable the defendants to avoid the contract for that cause. This question we understand to be independent of the buyer's option reserved in the contract, about which no point is presented here.

The position of the defendants is that the provision of the contract as to the average weight is a warranty, to be strictly and literally complied with. Assuming it to be so, we are of opinion that the construction of the clause adopted by the court at the trial was the correct one, to wit, that it was a warranty only against deficiency in weight. That appears to us to be the natural sense of the terms used, and is confirmed by the fact that the price was to be determined by the number of bags, and not by the weight. Upon this interpretation of the contract, it was not contended that the excess in weight was so great or essential as to constitute a substantial difference or want of identity in the article that was the subject of the sale.

The exception on account of the evidence admitted to show the fall in the price of gunny bags is presented in several aspects. 1. We see no reason why merchandise brokers in Boston, members of firms doing business and having houses established both in Boston and New York, might not properly be admitted to testify as to the market value, at a particular date, of an article of merchandise with which they were familiar, even though their knowledge was chiefly obtained from "daily price current lists and returns of sales daily furnished them in Boston from their New York houses." It is not necessary, in order to qualify one to give an opinion as to values, that his information should be of such a direct character as would make it competent in itself as primary evidence. It is the experience which he acquires in the ordinary conduct of affairs, and from means of information such as are usually relied on by men engaged in business, for the conduct of that business, that qualifies him to testify.

2. An unaccepted offer, as an isolated transaction, is not competent evidence upon the question of value. But in a market regularly attended by buyers and sellers, an offer as well as a sale of an article of recognized uniform character, constantly bought and sold in that market so as to have a place upon the daily price current lists, may serve to show that the market value of that article did not then exceed the price at which it was offered. It is admissible because of its publicity, and the presumption of the presence of dealers ready to purchase, and who would have done so if the offer had been below the market value. That dealers are themselves guided in their transactions by such indications of the state of the market makes the fact one that may properly be considered in evidence.

3. The objection that this evidence did not tend to show the value of similar goods in bond and for gold, is not tenable, at most, it only touches the weight and effect of the testimony. The fact that the sales quoted were for currency, "duty paid by the seller," does not necessarily imply that the goods were not in bond at the time. If they were so, the difference in both respects was a mere matter of computation. If they were not, and that fact would make any appreciable difference in the market value, we see no reason why witnesses who were engaged in the trade might not readily estimate that element of difference, and we

must presume that they did so. There is nothing in the case to show that they were not competent for that purpose.

The objection to the testimony on this point, as taken at the trial, does not appear to have been upon the ground that it was hearsay.                                   *Exceptions overruled.*