### GLECKLER *et al.* v. SLAVENS *et al.*

1. Where, as their cause of action, plaintiffs plead a contract, performance on their part, and a breach by defendants, the defendants answer, denying the alleged breach on their part, and for a counterclaim allege a breach on plaintiffs' part, the plaintiffs may, in reply to the counterclaim, allege a further and independent agreement by defendants, not as modifying or adding to their cause of action as stated in their complaint, but to estop defendants from asserting their counterclaim.

2. So, where plaintiffs plead a full compliance on their part with an agreement to deliver, as successively called for by defendants, beef cattle of a prescribed quality, condition and average weight, and a refusal by defendants to receive certain later offerings, and the defendants plead a counterclaim for damages, on the ground that such later offerings did not fulfill the requirements of the contract as to quality and weight a reply to such counterclaim that defendants agreed that, if plaintiffs would put into their earlier deliveries their best and heaviest cattle, they would accept the remainder on the contract, and that by so doing the average weight of the remainder was materially reduced, although the average of the herd before the heaviest were thus taken out would have greatly exceeded the requirement of the contract, is not inconsistent with the cause of action stated in the complaint, and does not constitute a departure therefrom, as such new facts are not pleaded as an abandonment of plaintiffs' claim of compliance on their part, or as new grounds as a cause of action, but as facts which ought to estop defendants from asserting such counterclaim.

3. So far as the evidence upon any question of fact is substantially conflicting, the verdict of the jury, if such question were submitted on proper instructions, is conclusive upon this court.

4. To constitute an estoppel in favor of plaintiffs it was not necessary that they testify categorically that they relied upon the promise of defendants, and when the testimony is that defendants requested plaintiffs to

deliver the largest and best cattle first, giving their reasons for so desiring, and promised, if they would do so, to accept the remainder of the herd, and "under the circumstances" plaintiffs agreed to and did do so, and that the reason for so doing was the promise of defendants, the jury might, so far as this particular question was concerned, find for plaintiffs.

5. Where the contract provided that plaintiffs should hold in the vicinity of the Rosebud Indian agency, where the cattle were to be delivered, the number of beef steers required to fill such contract, so as to be able to deliver as and when notified thereto, no length of notice being fixed in the contract, and defendants notified plaintiffs that a certain number would be required in September; and where plaintiffs, in pursuance of such notice, in good faith moved said cattle into closer proximity to said agency than they otherwise would, and closer than the contract required, and so held them there at an increased expense, said cattle not being received or called for by defendants,—it was neither error in the court to instruct nor the jury to find that the plaintiffs were entitled to recover from defendants such increased necessary expense.

6. Where the notice from defendants that cattle would be required in September was general, fixing no definite day for delivery, and the conditions of the contract evidently contemplated that a certain number of cattle wanted would be called for and a particular time for delivery designated by defendants or their agent, when they would be ready to receive them, and participate in the transfer, and plaintiffs were ready at all times to respond to such call, no physical tender by plaintiffs of any number of cattle was required until defendants indicated the number wanted, and the time when they would be received.

7. Where a witness testifies that he has been in the cattle business "off and on" for the past 20 years, and that for the past 7 or 8 years that has been his principal business, and it appears that he has made a contract for the sale and delivery of a large number of beef cattle at Rosebud agency at about the time which is the subject of inquiry, and he further states that he thinks he knows the market value of such cattle at that place and time, his opinion upon that point is competent evidence.

8. It is not required that an expert witness stand at the head of his class to make his evidence admissible. The jury will determine the value of his opinion from the knowledge which he shows himself to possess.

9. A party cannot complain of the admission of competent evidence to sustain an allegation of fact which by his answer he has put in issue, although such fact may not appear to be material.

10. The assertion or admission of an independent fact in a reply to a counterclaim goes only to the counterclaim, and does not destroy or settle the issue upon such fact as made by the complaint and answer.

11. Where plaintiffs offered cattle for delivery under their contract with defendants, to which defendants objected on account of their quality and weight and the manner of their delivery, defendants could not, in the absence of consent by plaintiffs, receive the cattle, and compel plaintiffs to submit to a discount on the price.

12. If the cattle so offered, or the manner of their offering, were not as required by the contract, defendants might refuse to receive them, and hold plaintiffs for a breach, but neither their convenience nor the necessities of the Indians for whom they were designed would, in the absence of consent by plaintiffs, create a right to take them, and pay their value, without regard to the contract price.

13. Where a witness (J. W. L. Slavens) was allowed to testify that a letter purporting to have been written at "Kansas City," and dated "November 9th, 1891," and signed "H. C. Slavens," was in fact written by him at Rosebud agency, November 13, 1891, and signed "H. C. Slavens," it was not error in the trial court to refuse evidence as to the particular reason for it being so written.

14. When by the contract it was agreed that at the last delivery of cattle in November defendants should receive and pay for such cattle within the number and aggregate weight stipulated for in the contract, and defendants notified plaintiffs, in advance of the time for such delivery, that they would not receive them, and never withdrew such notice, but allowed plaintiffs to retain the understanding that they would not accept them, plaintiffs were not obliged to make a further offer or tender of the cattle.

(Syllabus by the court.   Opinion filed May 28, 1894 ).

Appeal from circuit court, Hughes county. Hon H. G. FULLER, Judge.

Action to recover damages for breach of contract. Plaintiffs had judgment and defendants appeal. Affirmed.

The facts are fully stated in the opinion.

*Crawford & DeLand,* for appellants.

It is not the province of a reply to introduce a new cause of action. The plaintiff can recover, if at all, only on the causes of action stated in his complaint. That part of the reply which alleges a new contract to deliver the best cattle first is inconsistent with the complaint, and is a material departure and cannot stand. Durbin v. Fisk, 16 O. S. 533; Hastings v. Caldwell, Hamilton, 16 Neb. 688; Philibert v. Burch, 4 Mo. Ap.

470; McAroy v. Wright, 25 Ind, 22; Bearss v. Montgomery, 46 Ind. 544; Webb v. Bidwell, 15 Minn. 479; Gould's Pl. Chap. 4, § 8, p. 173; Tullis v. Orthwrin, 5 Minn. 377; § 135, Wait's Ann. Code N. Y.; 2 Wait's Pr. 440-2; Maxwell on Code Pl. 557-61; Pomeroy on Rem. & Rem. Rights, 664; Bliss on Code Pl. §§ 393, 396; 1 Thompson on Trials, 197; Ry. Co. v. Paine, 7 Sup. Ct. Rep. 323; 1 Greenleaf on Ev. § 27.

The evidence as to this new contract that the best cattle be delivered first, is insufficient to create an estoppel. To create an estoppel, statements or representations must be plain; very clear; they must be clearly proved; nothing can be left to inference; they must have naturally led to the action taken; they must have been acted upon and been the exclusive cause of action. Preble v. Conger, 66 All 370; Flower v. Elwood, 66 All 438; Bigelow on Estoppel, 532, 437, 440, 493, 492, 476; Herman on Estoppel, 55, § 606; Ellenwood v. Fulty, 63 Barb. 321, 330.

It was error for the court to submit to the jury a fact or a state of facts which there was no evidence tending to prove, or to give instructions in reference to a state of facts not in evidence. Herdick v. Bigler, 47 Penn. St. 60; Kelso v. Townsend, 13 Tex. 140; Webster Col. v. Tyler, 35 Mo. 268; Railroad v. Swift, 26 Ind. 439; Railroad v. Jacobs. 20 Ill. 487; Swank v. Nichols, 24 Ind. 199; Ins. Co. v. St. Mary's Sem., 52 Mo. 480; Andreas v. Ketchum, 77 Ill 377; Moffit v. Conklin, 33 Mo. 457; Shellito v. Sampson, 61 Ia. 40; Manning v. Burlington, 64 Ia. 240; Newton Wagon Co. v Dier, 10 Neb. 284; Ewing v. Runkle, 20 Ill. 448.

It is a rule with all contracts with the government that the contracting party shall stand ready to furnish the goods when the same are required, and the government has the option to decide in regard to the quantity and the time of delivery. Meriam v. U. S., 2 Sup. Ct. Rep. 68; Lobenstein v. U. S., 1 Otto 324; Brawley v. U. S. 17 How.; Kilburg v. U. S., 7 Otto 398; Bulkley v. U. S., 22 Law Ed. 62.

In cases like the one at bar the measure of damages is the difference between the contract price and the market value at

the time when, and at the place where, it should have been delivered. 1 Sedg. on Damages, p. 552, note B; McCullum v. Huntington, 51 Ind. 229; Grand Tower v. Phillips, 23 Wall. 471; 1 Sedg. on Damages, p. 553. It was error, therefore, for the court to admit the evidence relating to the sale of steers in Sioux City, as the place of delivery was Rosebud agency.

Under the contract sued upon the plaintiffs were bound to deliver 155 head of cattle on the morning of the 13th of November, at the agency, of the kind and quality named in the contract. When on that date therefore the plaintiffs presented about 800 head of cattle not of the kind and quality named in the contract, they did not fulfill the terms of their contract and were in default. Stephenson v. Burgin, 49 Penn. St. 36, 46; Smith v Loomis, 7 Conn. 110; Barnes v. Graham, 4 Cowan, 452; Parsons on Contracts 635; 2 Par. on Contracts, 647-8; Barney v. Bliss, 1 D. Chip. 399. The fact that a storm inte fered with penning the cattle is no defense. 2 Benj. on Sales, §§ 864, 751, 1030, 899, 1048; Eddy v. Clement, 38 Ver. 486; Bacon v. Cobb, 45 Ill. 47; Croninger v. Crocker, 62 N. Y. 151-7; Clark v. Baker, 11 Metcalf 186; Brewer v. Railway, 104 Mass. 593.

The purchaser may retain the portion delivered, and may set off against the purchase price his damages for failure to deliver the balance according to contract. 2 Benj. on Sales, §§ 1032, 1348, 1354; Hylands Chemical Co. v. Mathews, 76 N. Y. 145; Wolf v. Gerr, 43 Ia. 339.

The refusal by defendants to pay for one delivery only would not amount to an absolute refusal, and would not release plaintiffs from making a separation and tender of the balance under their contract. 2 Benj. on Sales, §§ 906, 899; Scott v. Kittanning Coal Co., 89 Penn. St. 231-7; Higgins v. Railroad, 60 N. Y. 555.

The acceptance of a part of the articles is no waiver of the defects in the balance. Sedg. on Damages, 552 on notes; McCollum v. Huntington, 51 Ind. 229; Miles v. Miller, 12 Bush. 134; Grand Tower v. Phillips, 23 Wall. 471; 1 Sedgwick 552, 558; Creighton v. Comstock, 27 O. 548.

*Horner & Stewart*, for respondents.

The reply in this case was not inconsistent with the complaint. In the complaint the plaintiffs alleged a contract and the fulfillment of its terms on their part, and breaches on the part of the defendants. The defendants answer, denying their failure to fulfill the contract, and alleging that plaintiffs failed to perform their covenants in the contract, and asking affirmative relief by way of counter-claim. The plaintiffs reply to this counter-claim, alleging a subsequent agreement of defendants by which they are estopped to plead or prove their counter-claim. The theory of an estoppel is never to base affirmative relief thereon, but only to refuse to the party sought to be estopped the right to plead and prove what may be a right of action. Steph. Pl. 410; 1 Chitty Plead. 677; Rosby v. Railroad, 33 N. W. 698; Eikenberry v. Edwards, 32 N. W. 183; Anderson v. Imhoff, 51 N. W. 845; Brown v. Bank, 13 N. E. 56; Bishop v. Travis, 53 N. W. 461; Ankeny v. Clark, 20 Pac. 583; Trainor v. Wouman, 25 Mo. 501; Paxton Cattle Co. v. First Nat'l Bank, 33 N. W. 54 271, 282; Kimberlin v. Carter, 49 Ind. 11.

In proving the market value of a particular class of personal property at a particular time, evidence is always admissible tending to show what was the market value of the same kind of personal property at the nearest general market, together with the cost of the transportation of the personal property to this nearest general market. Abbott's Trial Evidence, p. 308.

When the defendants notified the Indian agent at Rosebud agency not to issue vouchers to the plaintiffs for cattle already delivered to defendants, followed by the refusal of the agent to so deliver the vouchers, the defendants broke the contract by their refusal to perform. One party cannot refuse to perform and at the same time demand performance on the part of the other. Dey v. Dox, 24 Am. Dec. 157; Clark v. Pinney, 7 Conn. 681. To the same effect we cite Comp. Laws, § 3433; Gaylord Mfg. Co. v. Allan, 53 N. Y. 515; Reed v. Randall, 29 N. Y. 359.

VOL.5,S.D.—24

KELLAM, J. This is an action to recover damages for breach of a contract. H. C. Slavens, one of the defendants, now appellants, had a contract with the commissioner of Indian affairs for supplying the Rosebud agency with beef cattle for issue to the Indians, the terms of which were fully disclosed by the pleadings in this case. To fill this contract, the Slavens made a contract with the plaintiffs, now respondents, by which the plaintiffs undertook to furnish and deliver to defendants at said Rosebud agency, during the months of September, October and November, 1891, 1,400 head (subsequently by agreement reduced to 1,200) of good straight, merchantable steers, not over 7 years of age, to weigh not less than 900 pounds average, for each delivery, and no steer to weigh less than 800 pounds. The cattle to be so furnished and delivered were, by such agreement, to conform in all respects to, and fill the requirements as to quality and condition of, the contract between Slavens and the commissioner of Indian affairs. By their said contract the plaintiffs agreed to hold in herd in the vicinity of the agency the number of beef cattle required for the fulfillment of their contract, and to deliver the same to the Indian agent at said Rosebud agency, upon notice by him or by the defendants that cattle were required for issue. It was further agreed in the contract with plaintiffs that deliveries of these cattle should be made during each of the months named in numbers and amount in weight as the agent at said agency should require for issue, or call for, or as defendants should call for, for such issue. It was also agreed in said contract that at the last call for cattle which should be made by the said agent in the month of November the whole remaining and undelivered portion of the 1,200 head should be weighed and delivered by plaintiffs to defendants, and the defendants agreed to receive and pay therefor the same contract price, to-wit, $2.75 per 100 pounds gross weight, and upon the same conditions as to quality and weight. By this contract it was also agreed that the plaintiffs should receive from the

agent at Rosebud agency the receipts and vouchers in full for all beef cattle delivered to him by plaintiffs under this contract, upon which they were to draw on defendants at Kansas City, which drafts defendants agreed to pay on presentation. The contract of Slavens with the commissioner of Indian affairs required that the cattle to be delivered under it must have been at least 12 months in succession prior to July 1, 1891, north of the south line of Kansas. In October plaintiffs made three deliveries of cattle at the Rosebud agency, upon call of the agent under this contract, and received vouchers and payment therefor. The plaintiffs made three distinct claims for damages: First, for 128,610 pounds of beef cattle alleged to have been delivered under said contract on the 13th day of November, for which payment has not been made; second, for the refusal by defendants to take and accept and pay for according to the terms of their contract the portion of the 1,200 head remaining undelivered after the delivery and issue of November 13th; and, third, for holding cattle in the vicinity of Rosebud agency for delivery and issue in the month of September. The case was tried before a jury, and the plaintiffs had a verdict. From the judgment entered thereon, and an order overruling a motion for a new trial, defendants appeal.

The case was evidently tried with great spirit and earnestness on both sides. The record is a very long one, and the assignments of error very numerous. Appellants have grouped these under four heads, and we can probably more clearly follow their argument by doing the same. They are classed as: (1) Those relating to the admission of testimony upon the question of damages sustained by plaintiffs for holding the herd of cattle in the vicinity of the agency during the month of September, 1891, and the instructions given and refused upon this branch of the case; (2) those relating to the admission of testimony as to the market value of such cattle at Chicago and Sioux City on the 13th day of November, 1891; (3) those relating to the conversation between Mathieson, one of the plain-

tiffs, and the defendant, J. W. L. Slavens, on the morning of October 2, 1891, in regard to the picking out and delivering the largest and best cattle at the first two deliveries, and the admission of such evidence under the reply, and the reply, and the instructions on this point; (4) those relating to the quality of the cattle presented on the 13th day of November, 1891, by plaintiffs, and to the delivery of cattle on that day.

Still pursuing the order of counsel on both sides, we first notice the alleged errors grouped in the third class. The appellants contend that these errors result from a wrong theory maintained by plaintiffs and respondents, and adopted by the trial court, as to the effect and force of that part of plaintiffs' reply to defendants' counterclaim wherein it is alleged that at the request and by arrangement with J. W. L. Slavens, one of the defendants, the plaintiffs picked out the largest and best cattle in the herd for the deliveries of October 13th and 17th, and thus greatly reduced the average weight and quality of the remainder; defendants agreeing that, in consideration of plaintiffs so doing, they would accept the remainder of said cattle to fill out the said 1,200 head in number, or 1,200,000 pounds in weight. Appellants insist that, having based their cause of action in their complaint upon a full compliance with their contract, plaintiffs must rely upon such a case and prove it; and that the allegations of the reply were inconsistent with and a departure from, those of the complaint. But it must be remembered that the reply does not assume to state the grounds of plaintiffs' cause of action, but only attempts to present reasons why defendants' counterclaim ought not to prevail. The counterclaim rested upon the alleged fact that plaintiffs had failed to provide the cattle of the quality agreed upon in the contract. We would understand the position of the parties under their pleadings to be as follows: Plaintiffs claim to have fully performed their contract. Defendant's deny, and for a counterclaim allege affirmatively that plaintiffs failed to furnish cattle of the condition and quality defined in their contract, and

ask to recover damages therefor. Plaintiffs, still insisting that they have fully performed as alleged in their complaint, say further by their reply that defendants are not in position to assert the counterclaim, because if it were true that after the deliveries of October 3d and 17th the remainder of the herd did not average as provided in the contract, it was for the reason that the average had been so reduced at the solicitation and instance, and for the advantage of, defendants themselves. In other words, that they could not thus induce the plaintiffs to put into the early deliveries their best and heaviest cattle, under a promise that they should not suffer thereby, and then base a claim for damages upon the very conditions which resulted from the doing of just what they asked and procured to have done. The reply was not a modification of or departure from the plaintiffs' cause of action, as stated in their complaint, but was a statement of facts designed to estop defendants from asserting other facts upon which to base a counterclaim. It did not set up new facts upon which plaintiffs rested their cause of action, but pleaded facts designed only to meet defendants' counterclaim, and to show that, even if plaintiffs did not succeed in proving their cause, the defendants ought not to be allowed to assert and prove a counterclaim, because to do so would, in effect, violate their agreement with plaintiffs, and thus allow them to take advantage of their own wrong. Suppose a defendant who is sued upon a promissory note answers that he never signed the note; that his signature is a forgery. The plaintiff may, in a reply, plead such facts of conduct on defendant's part as would estop him from taking advantage of the alleged forgery, without conceding that he is suing upon a forged note. He may stand upon his original cause of action, as stated in his complaint, that defendant signed the note, and at the same time plead, and at the trial prove, facts which would estop defendant from showing that the signature was not in fact his. The reply would not be inconsistent with the complaint. Defendants con-

tend, however, that the evidence is insufficient to establish an estoppel. So far as the evidence on this point is conflicting, we cannot, of course, determine what is proved. We can only inquire if there is any substantial evidence which, if fully believed by the jury, would create an estoppel.

Prefatory to noticing what this evidence was, we might say that it appears that the plaintiffs made four deliveries of beef cattle under this contract to the Indian agent at Rosebud agency. The first was made October 3, 1891, and averaged in weight 1,038 pounds; the second, October 17th, averaged 1,026 pounds; the third, October 31st, averaged 927 pounds; and the fourth, November 13th, averaged 863 pounds. By the contract between plaintiffs and defendants the cattle were to average 900 pounds, no animal to weigh less than 800 pounds, and to correspond with the government contract as to quality and weight. These facts, I think, are undisputed. From Mathieson's testimony we quote as follows: "Q. State the reason, if there is any reason, for the delivery of a larger and heavier class of cattle at the first delivery in October, under this contract. A. The reason was that the Slavens requested me to deliver the largest and best cattle for the first two deliveries. Q. State what was said—what you said and what he said. A. I stated that I had received his letter of the previous day, requesting me to put in the best cattle. I asked him why he wanted the best cattle put in first; why not take the average of the herd; they were all good cattle to fill the contract. And he said he wanted the best cattle put in first, for the purpose of making a good impression on the receiving officer. That it was his first delivery of cattle under his contract, and that, if I would put them in, he would take the remainder of the herd. Q. What did you say? A. I said I would deliver the best cattle first, under these circumstances. Q. Did you deliver the best cattle first? A. I did." Some of the questions which elicited these answers were objected to, and in one or two instances a part of the answer given by the witness was

excluded by the court, but the above is substantially the language of the witness allowed by the court. It appears that plaintiffs had about 1,300 head of cattle, from which they designed to turn in on this contract as many as would fill it. Their claim is that, excluding 25 or 30 two year olds, they would average 900 pounds. Mathieson so testified, and the jury might have so found. Defendants argue that the evidence does not create an estoppel, because, if the cattle were of the weight and quality claimed by plaintiffs, they could not be prejudiced by putting in the best and heaviest ones first, for the remainder would be all that the contract required. But plaintiffs' claim is not that each animal of the herd would weigh 900 pounds, but that the herd as a whole would average that; and such was the contemplation of the contract, for in it it was expressly provided that steers as light as 800 pounds would be received if others were sufficiently heavy to bring the average up to 900 pounds. It is very plain that, if from a herd of 1,200 or 1,300, whose average weight would be 900 pounds, 115 head were first selected, whose average weight was 1,038 pounds; and then 155 more, whose average weight was 1,026 pounds, the average weight of the remainder might be reduced below 900 pounds. If this result did follow, and the plaintiffs in consequence had left on their hands the remainder of the lot, whose average was thus reduced below the standard of the contract, they would certainly be prejudiced if the defendants were allowed to make a counterclaim for damages against them on account of the reduced average of the remainder of the cattle occasioned in such manner. It is further urged that an essential element of estoppel is lacking, in that plaintiffs did not testify that they relied upon, or were induced to act as they did by, such promise of defendants. In the testimony above quoted Mathieson says that the reason why the best and largest cattle were delivered first was that Slavens requested it, and then testified to what Slavens said, and what he promised if they were so selected and delivered, and that he agreed that

"under these circumstances" he would do so and then that he did. We think that the evidence tends to show all the elements of an estoppel, and that the jury might have so found. Thus much for the reply, and the evidence received under it, in its relation to the counterclaim.

Now, how did it affect the statement of the cause of action as set out in the complaint? To recover upon the contract the plaintiffs must have been able, willing, and ready to deliver such cattle as their agreement called for, and this they allege in their complaint they were willing and ready, and offered, to do. Mathieson's testimony tends to support such allegations. Referring to the herd driven to the agency from which the delivery for November 13th was to be made he says: "They were good, merchantable beef steers, and would weigh over 900 pounds." He further says that none of them would weigh less than 800 pounds. And again: "I had a conversation at the time the delivery was taking place as to the selection being made by the Indian agent and Major Earnest, and told Mr. Slavens they were selecting the smallest cattle there was in the herd. He said that was so, too, and also said that he did not think they were taking an average of the herd. The receiving officer took some of the two year olds." Other witnesses on the part of the plaintiffs testified that the cattle thus selected were not an average of the herd. These statements as to the weight and quality of these cattle, and Mathieson's testimony as to what was said by Slavens, are denied by some of defendants' witnesses, but for the purposes of this review questions depending upon the weight and force of conflicting evidence have been settled by the jury. If the reply abandoned the theory of the complaint, and set up a new state of facts, or a substituted agreement, upon which plaintiffs based their cause of action, it would be obnoxious to the criticism made by defendants, but it does not. It declares performance, or readiness to perform, on their part; and the evidence, whether convincing to us or not, tends to show it and seems to be satisfac-

tory to the jury. The evidence under this reply, which is criticised as being a new state of facts upon which plaintiffs rely as constituting their cause of action, was not offered by plaintiffs in proving their cause of action, but was offered in response to defendants' evidence of their counterclaim. Defendants could not reasonably claim to be surprised, either at the position of plaintiffs or their evidence to support it, for it was precisely what they were apprised by the reply would be claimed upon the trial. If defendants were in fact surprised, it is difficult to see how they could have been prejudiced. The estoppel rested upon an alleged conversation between Mathieson and J. W. L. Slavens. Each testified to what was said and what was not said. Neither could have sworn to more under any circumstances or by any preparation. We think the reply was consistent with the complaint, and the evidence properly admitted under the reply.

It is further insisted by defendants that no authority is shown by which J. W. L. Slavens could bind his codefendant by his agreement, if made, in respect to putting in the best and largest cattle first. It is true there is very little direct evidence as to the business relations between the two defendants, but in the testimony of J. W. L. Slavens he several times refers to himself and his son H. C. Slavens, the other defendant in the case, as constituting "the firm," and he explains why the government contract made with H. C. Slavens, one of these defendants, was made in his name, instead of in the name of "the firm." This evidence was all in when Mathieson testified as to the arrangement with J. W. L. Slavens for putting in the best cattle first. Defendants offered no objection to it on the ground of want of authority to bind both defendants. The parties and the court seem to have treated the partnership relation of defendants as conceded and recognized. It was the theory upon which this question was tried. Under such circumstances, we do not regard the objection as forceful. Under the second head counsel discuss the assigned errors relating to

the question of damages sustained by plaintiffs in consequence of holding the herd of cattle in the vicinity of the agency during the month of September, 1891, and to the instructions given and refused upon this branch of the case. The contract between plaintiffs and defendants provided for the delivery by plaintiffs of beef cattle at the Rosebud Indian agency "during the months of September, October, and November next." It further provides that "the party of the first part agrees to have and to hold in the vicinity of the agency the number of head of beef steers required for the fulfillment of this contract, and to deliver the same to the agent in charge of said Rosebud Indian agency, at the cattle corral of said agency, upon notice from the party of the second part, or his agent or representative, or the said Indian agent, that cattle are required for issue," etc.; and, further, "that deliveries of the same shall be made during each of the months named, in numbers and amount in weight as the agent in charge of said Rosebud agency shall require for issue each month, and shall call for same as above provided, or as the party of the second part may give notice to so. deliver for issue." It will be seen that the contract provides for deliveries of these cattle during the months named, not if they shall be called for, but as they shall be called for either by defendants or the Indian agent. The contract was with the defendants, and plaintiffs were obliged to regard and be bound by notice from them, no matter what the Indian agent said. If defendants notified plaintiffs to deliver cattle in September, they were doing just what the contract gave them the right to do. If the Indian agent declined to receive them, that was no concern of plaintiffs. The contract fixed the right of defendants to call for cattle, and the obligation of plaintiffs to respond to their call.

Mathieson testified that at Kansas City, after the making of the contract, and so when they had a right to do so, defendants notified him to have 400 head ready for delivery in September. This notice required them to have and hold in herd

in the vicinity of the agency a sufficient number of cattle from which to make such delivery. It is true again that this evidence is disputed, but, as we have before observed, we cannot weigh conflicting evidence. The jury has done that, and, if such questions were submitted under proper instructions, we must accept their conclusions. Plaintiffs could not decline to recognize and act upon notice from defendants, and justify their failure by showing that the Indian agent would not then receive cattle from defendants on their contract with the government. The plaintiffs had no relations with the Indian agent, except that that they had agreed in their contract that a notice from the agent to deliver should be accepted as a notice from defendants. By their contract with defendants, plaintiffs did not make themselves contractors with the government, nor did defendants' contract with the government become a part of or control the contract sued upon, further than as provided by its terms. The rights and obligations of these parties were fixed by the contract between them, and, except as specially provided, not by the contract of Slavens with the government. The evidence is that, pursuant to this notice, and acting upon it, the plaintiffs drove to and held in the near vicinity of the agency their herd of cattle from which to make the deliveries in September, and that, during the last days of August, Gleckler, one of the plaintiffs, was then with the cattle for the purpose of making the delivery, but his cattle were not received either by the defendants or by the Indian agent. Defendants' counsel insist that these facts do not constitute a tender of cattle, and without it plaintiffs cannot recover. We do not think a tender was required. No specific day for their delivery was named in the notice. They were to be kept off feed and water for twelve hours prior to weighing. This would necessitate a specific time being fixed by further notice. At the express instance of defendants, they had put themselves in position to take the cattle off feed and water, and weigh them at the corral whenever they would be received. They could proceed no fur-

ther until another step was taken by defendants. To have penned them, and kept them off feed and water for twelve hours, without any further notice from defendants or the Indian agent indicating a readiness to receive them, would have been unauthorized and foolish. Having in apparent good faith done all they could do until defendants acted, nothing more was required of them. Plaintiffs were holding these cattle there for such notice. They were so holding them under a notice from defendants, from which they might reasonably understand that such further notice would be given. Under their contract defendants could not place plaintiffs in that condition, and then ignore them, without incurring liability. Under the circumstances, no formal physical tender was necessary, and especially where it is entirely evident that such tender would have been futile, the defendants justifying their failure to receive on the distinct ground that they were under no obligation to receive, and that plaintiffs had no right to offer.

The duties and liabilities of plaintiffs under their contract with defendants were not measured by the duties and liabilities of H. C. Slavens under his contract with the government. We do not, therefore, regard the authorities cited by appellants, construing peculiar provisions of government contracts, as applicable, except to the extent that such or equivalent provisions appear in this contract. We think the cases cited by appellants turn upon conditions and terms which perhaps may be found in Slavens' contract with the government, but which are not found in, or made a part of, the contract between plaintiffs and defendants. In Lobenstein v. U. S., 91 U. S. 324, the contract was that Lobenstein should have all the hides of beef cattle slaughtered for Indians at Ft. Sill "which the superintendent of Indian affairs at that place shall decide are not required for the comfort of the Indians, the number of hides to be about 4,000, more or less." The court held that by the express terms of the contract Lobenstein was only entitled to such hides as the superintendent of Indian affairs decided were not

required for the Indians, and, having decided that there were none such, that the comfort of the Indians required that the cattle be issued to them on foot, and that they have the hides. Lobenstein was bound by the decision of the superintendent, who, by the contract, was constituted the final arbiter in the matter; that he had agreed in advance that his right to hides should depend upon the superintendent's decision as to what was required for the comfort of the Indians; and that the number, "about 4,000, more or less," was an estimated, not a guaranteed, number, and still subject to the general condition that the superintendent might decide whether or not there were any hides not required for the comfort of the Indians. So in Brawley y. U. S., 96 U. S. 168, the contract was for 880 cords of wood, "more or less, as shall be determined to be necessary by the post commander," and the court held that the contractor, Brawley, was not entitled to deliver and collect pay for more wood than the post commander determined to be necessary, for the parties had expressly made the judgment of the commander determinative of the amount of wood which the contract covered. We notice these cases only as representative of those cited by appellants. They do not govern the case at bar, because the terms of the contract between plaintiffs and defendants do not permit it. The contract does not provide for an estimated number or weight of cattle, more or less, to be determined by the judgment of the Indian agent or anybody else, but says: "It is further understood and agreed by the parties hereto that the sum and amount of 1,400,000 is the true and exact amount required to be delivered under this contract, as designated above by the terms 'fourteen hundred of beef steers, more or less.'" Whatever may have been the contract between Slavens and the government, by which the right of Slavens to deliver and the duty of the government to receive any cattle was to be left to and determined by the decision of the Indian agent at Rosebud agency, such provision, if any, is not found in the contract between plaintiffs and defendants. It was not an option

contract on the part of Slavens, but a contract to receive a definite number of cattle, or its equivalent in weight, provided they filled the contract conditions as to quality and weight. From the evidence it appears that late in August plaintiffs drove their cattle from their ranch on Bad river, about eighty miles distant, to the neighborhood of the agency, for the purpose of the September deliveries, and notified the agent at Rosebud. The agent in turn notified them that no cattle would be required or accepted from Slavens for the month of September, but this information, as we have already attempted to show, would not excuse plaintiffs from being ready to deliver to defendants on their contract with them, in pursuance of notice before given. Suppose Slavens had desired to make a tender of cattle in September, on the theory that the government was then bound to receive them; it was no concern of plaintiffs to inquire why the defendants wanted the cattle there at that time. It was sufficient for them that they had agreed to have them there when notified by defendants, and that they had been so notified. Defendants insist that by the terms of the con tract plaintiffs were required to hold their cattle in herd in such proximity to the agency as would enable them to promptly deliver them upon notice, and that they actually did no more than this. The contract of H. C. Slavens with the government provided for delivery on five days' notice, but in the contract between plaintiffs and defendants no length of notice was fixed, and so a reasonable notice must have been intended. What would be a reasonable notice under some circumstances might not be a reasonable notice under different circumstances. What would be a reasonable notice to deliver cattle eight or ten miles distant from the place of delivery would not be a reasonable notice if the cattle were eighty miles distant. When defendants notified plaintiffs that cattle would be required in September, and to be in readiness to deliver at that time, when called for, they put themselves in position to insist that a shorter notice was reasonable than would be if they had not given such

first notice. The question of damages on this ground was sub mitted to the jury under instructions that, if they should find from the evidence that in consequence of notice from defend- ants to plaintiffs that they would require cattle under the con- tract for September, being reasonably convinced that such ac- tion was necessary on their part, the plaintiffs in good faith moved and held their cattle in closer proximity to the agency than they otherwise would, and closer than they were required to do under their contract, the defendants were liable for the necessarily increased expense of so holding the cattle in the immediate vicinity of the agency. We think there was no error in this instruction.

The alleged errors named in the third group relate to the admission of evidence as to the market value of cattle at Rose- bud agency on the 13th day of November, 1891. Mathieson, as a witness, was interrogated as follows: "Q. State, if you know, the market value of good, straight, merchantable cattle of the kind mentioned in this contract at Rosebud Indian agency on the 13th day of November, 1891.—the market value I mean." He answered, "$2.25 per hundred pounds." "Q. The question is, if you know the value. State if you know the market value. Answer the question 'Yes' or 'No.' A. Yes, I think I know. Q. State what the market value was. A. $2.25 per hundred pounds gross weight." Defendants' counsel ob- jected severally to these questions and answers, on the ground that the witness had not shown himself competent to testify as to such market value. The overruling of this objection is as- signed as error. The witness had previously testified that he had been in the cattle business "off and on" for the past 20 years, and for the last 7 or 8 years his principal business had been buying and selling cattle. That during the last two years he had handled three or four thousand head of cattle. As a cattle man he had made this contract with defendants for the delivery of a large number of cattle at this place, Rosebud agency. While he had not definitely stated his sources of infor-

mation as to the market value at that particular place upon that particular day, he had shown such a general knowledge of the subject as to allow his judgment to go to the jury without legal error. In Enos v. Insurance Co. (S. D.) 57 N. W. 924, in discussing an objection to evidence on the same grounds, we said: "It is not required that an expert witness stand at the head of his class to make his evidence admissible. His preliminary examination must show such knowledge of the subject as will enable him to speak with intelligence. The jury will determine the value of his opinion from the knowledge which he shows himself to possess." In Whitney v. Thatcher, 117 Mass. 527, the court said: "It is not necessary in order to qualify one to give an opinion as to values, that his information should be of such a direct character as would make it competent in itself as primary evidence. It is the experience which he acquires in the ordinary conduct of affairs, and from means of information such as are usually relied on by men engaged in business for the conduct of that business, that qualifies him to testify." See, also, Insurance Co. v. Horton, 28 Mich. 173; Bedell v. Railroad Co., 44 N.Y. 367. The witness testified in his cross-examination that there was no market for cattle at that time at Rosebud agency, and that he based his opinion of their value at that place upon his knowledge of their market value in Chicago, which was the nearest market he knew of for cattle of that kind, and the cost of getting them there. Gleckler, as a witness, gave similar testimony as to the value of the cattle at Rosebud agency, except that his judgment was based upon values in Sioux City, and the cost of transportation. Afterwards, upon motion of defendants' counsel, the court struck out the testimony of Mathieson "concerning the market value of this class of cattle in the city of Chicago" at that time, and so much of Gleckler's testimony as related to values in Sioux City. We are inclined to think (though it is not necessary to so decide, and we do not) that this testimony might have remained in the case without error. It would not follow that, because there

was no market at Rosebud agency, the cattle had no value, or that their value could not be proved in the manner explained by the witness. Nor does it follow that there was a market at the agency, and the testimony, for that reason, incompetent, because Slavens and other witnesses afterwards testified that there was a market there at that time. If there was no market at Rosebud, and the jury might have so believed, we can see no error in allowing the jury to get what information they could from these witnesses, they fully explaining upon what they based their judgment. In passing upon this question the trial court could not assume that defendants' testimony was true and that plaintiffs' was untrue, and so, upon the theory that there was a market at Rosebud, reject evidence that would have been competent if there was no market there. The court did all it could rightfully when it left the conflict to the jury and instructed they must determine the value of the cattle at Rosebud agency.

We come now to the fourth group of alleged errors, which relate to the quality of cattle presented on the 13th day of November, 1891. First, the defendants claim error in the admission of testimony as to the three deliveries of beef cattle previous to November 13th, on the ground that there was, and could be, no dispute concerning the quality and condition of the preceding deliveries, because they were accepted and paid for by defendants, and that it was so admitted in the answer. The complaint specifically alleges the making of the contract sued upon, and avers these deliveries in pursuance of it as in partial performance by plaintiffs of their contract. The answer denies "each and every allegation in said complaint contained" except that plaintiffs are copartners. Defendants and appellants however, contend that the further statements of the answer specifically admit that these deliveries were made, and assert that they were accepted and paid for by defendants, thus making it unnecessary and improper for plaintiffs to prove the same. In

their first defense defendants denied the making of the contract and the deliveries under it. In a further independent and affirmative defense they allege the making of a contract, setting it out in legal effect, and the delivery of cattle under it; the dates and number and weight corresponding with those given in the complaint. It is unnecessary to inquire particularly whether these further allegations as a part of an independent defense were in fact an admission that the contract and the deliveries alleged in the complaint were made, for, even if they were so intended as a constituent part of the second defense, they did not affect or destroy the force of the denial which constituted the first defense. The defendants might still stand upon their denial. Stebbins v. Lardner, (S. D.) 48 N. W. 847, and cases there cited. While the fact of the former deliveries having been made may not have been very material, we do not think defendants can complain of the admission of evidence, proper in form and character, to prove an issue which they had tendered. The last delivery of cattle was made November 13th. The circumstances attending this delivery, the quality of the cattle offered, and the effect of what was then and there done and said upon the rights of the parties, respectively, are fruitful sources of contention. It appears that on the 11th day of November 155 head were called for, to be delivered on the 13th. Under their contract it was plaintiffs' duty to put the requisite number in the pen, and have them in condition to be weighed. They did not do this. In explanation of this failure the evidence tends to show, and we think is undisputed, that on the evening and night of the 11th a violent storm set in, which drove and dispursed the cattle; that the herders, though working constantly day and night, did not succeed in collecting and bunching the scattered herd until late in the night of the 12th, and then, finding themselves unable to select and sort out the required number, they drove the entire lot of 800 head into the wing of the cattle pen, holding them there until daylight. This was not a strict, and probably not a substantial, compliance

with what they had undertaken in their contract. If not, de-
fendants might then and there have refused to receive cat-
tle so offered; but they did not do it. They contend, however,
that by accepting the cattle under such conditions, they did not
waive the breach, because of the necessities of the situation;
that 4,000 hungry Indians were waiting for the issue; and that
under these circumstances the government by its Indian agent
might take such cattle as were required, and discount the price
even against the protest of plaintiffs. This the agent might do
as against Slavens, for their contract so expressly provided;
but there was nothing in the contract between plaintiffs and de-
fendants so providing. In its contract with Slavens the gov-
ernment had provided for such an emergency, and for that rea-
son could compel him to submit to such discount; but in defend-
ants' contract with plaintiffs they had not so provided and con-
sequently could not compel the plaintiffs to so submit. It was
purely a contract right, and existed only where it had been so
agreed. Mathieson had a perfect right to say to Slavins: "If,
in your judgment, these cattle do not fill the requirements of
my contract with you, your only course is to refuse to receive
them, and hold me for a breach of my contract; but if you take
them at all you take them on the contract, and pay the contract
price." Mathieson swears that he distinctly refused to let the
cattle go in at a discount; that Slavens then had a talk with the
agent or superintendent, or both, which he (Mathieson) did not
hear, and came back to him and told him, "It is all right, and
that they would accept the cattle;" that he (Mathieson) did not
consent to any reduction of price, and did not suppose that any
was to be made until the next day. It is plain that whatever
discount Slavins agreed upon with the agent, or whatever action
the agent or the inspector took, could not bind the plaintiffs.
Upon these facts—all of which there was evidence tending to
establish—we think the jury might reasonably have concluded
that, so far as the delivery of that day is concerned, Slavens
waived his objections, if he had any, to the quality of the cattle

and the conditions under which they were delivered. If so, and defendants should be held to have received the cattle on the contract, they are liable for the contract price. The day after this delivery Mathieson applied at the agent's office for his vouchers for the cattle delivered, in accordance with his contract with defendants. The chief clerk refused to deliver the same to him, and, as his authority for so refusing, gave him a letter, directing that the vouchers be withheld from plaintiffs, and sent to defendant H. C. Slavens at Kansas City. This letter was dated at Kansas City, November 9, 1891, and signed "H. C. Slavens." This letter, on its face, apprised Mathieson that four days before the delivery of these cattle, and while plaintiffs were in no default, but were in the condition of having fully kept their agreement, both as to quality of cattle and conditions of delivery, and four days before defendants could have known that there would have been any default, the defendant Slavens had, in violation of the terms of the contract directed the agent at Rosebud to withhold from plaintiffs the vouchers which the contract provided should be delivered to them, and upon which they should draw upon defendants for their pay. Mathieson would naturally, and might reasonably, interpret this as a premeditated and inexcusable violation of the contract. Upon the trial, Slavens testified that the letter was in fact written at Rosbud agency, and after the delivery had taken place. Appellant based an assignment of error upon the rejection of his offer to prove that the letter was written by the witness J. W. L. Slavins, and that he affixed the signature of H. C. Slavens thereto, and dated it at Kansas City, November 9th, because the technical form of the government contract required such a notice to purport to come from the contractor, who was H. C. Slavens. The witness was allowed to tell what he did, and when and where he did it. Why he did it was neither material nor competent, and there was no error in the ruling. Assuming it to be a fact that this letter was actually written at the agency, after the delivery of the cattle, and in

the belief on Slavens' part that plaintiffs had broken their agreement as to the quality of the cattle, and the method of delivery, neither plaintiffs' rights nor Mathieson's conduct could be measured or controlled or judged by that fact, for Mathieson did not know it. He only knew what the letter informed him, and that only told him that, before any failure or default on their part had been in any manner suggested, the defendants had determined to break their agreement for the delivery to him of vouchers for beef as delivered to the agent. He was, of necessity, looking at the situation just as defendants had made it appear to him, and, in the absence of explanation, he was justified in saying and doing just what he would have been justified in saying and doing if the letter had in fact been written when and where it purported to have been written. By subsequently showing at the trial that the letter was not written when and where it purported to have been written, its effect at the time could not be destroyed, nor the then status of the parties changed. The letter referred not only to the delivery of the 13th of November, but to all future deliveries, and "until further advised."

The next question of importance is the effect of the notification of plaintiffs by defendants on the 13th and 14th of November that they would not accept the remainder of plaintiffs' cattle as and in fulfillment of their contract. By the contract it was agreed that at the last delivery in November the defendants should accept of plaintiffs the remainder or undelivered portion of the 1,200 head, or its equivalent, 1,200,000 pounds, as had not been called for during the three months of September, October and November. It would seem from a letter from Gleckler to defendants, introduced by defendants, and which J. W. L. Slavens testified was received early in November, that plaintiffs understood that the issue of the 13th of November was to be the last, and that at that time it would be the duty of defendants to receive the remainder of the 1,200,000 pounds of beef cattle. How they got such understanding, or whether it was

mutual or not, we do not know, and it perhaps is not important. In H. C. Slavens' letter, however, to the Indian agent, directing the withholding of vouchers from plaintiffs, he speaks of the delivery of the 13th as being understood by plaintiffs to be their last, and does not suggest that he has any different understanding. Notwithstanding this, it does appear that late in November another call was made by the Indian agent upon Slavens for cattle under his contract with the government, but no call was made by defendants or the Indian agent upon the plaintiffs under their contract. Defendants contend that this call was unnecesary, because it would have been useless and inoperative, plaintiffs having driven their cattle away from the vicinity of the agency to the ranch, 80 miles distant. It does not seem necessary to spend much time over the discussion of this particular question for both parties must be governed by the same rules of law in respect to the necessity of performance or readiness to perform. If defendants' unqualified refusal to accept the remainder of the cattle on their contract, on the ground that they were not of the quality and condition required by the contract, did not excuse plaintiffs from making a further offer of them under the terms of the contract, then the same facts would not excuse defendants from giving notice to plaintiffs under the terms of the contract. If the contract conditions were still in force as to the one party, they were as to both parties. The evidence leaves no doubt in our minds, and we think it so appeared to the trial court and jury, that after the disagreement of the 13th and 14th of November neither party expected any further performance by the other of the contract between them. Each regarded the conduct of the other as a flagrant and final breach and abandonment of the contract, so far as performance was concerned, and that thenceforth its only use and value would be as a basis for a claim for damages that each would make against the other. If the remainder of these cattle were of the condition and quality which the contract required defendants to accept, and they informed plaintiffs, in advance of

the time of delivery, that they would not receive them, and never informed plaintiffs otherwise, but allowed them to retain the understanding that they would not accept them, plaintiffs were not obliged to make a further offer of the cattle. This is the law of this state by statute (Section 3433, Comp. Laws), and would be without such statute. 2 Pars. Cont. 188; Bunge v. Koop, 48 N. Y. 225; Crist v. Armour, 34 Barb. 378; Haines v. Tucker, 50 N. H. 307. The defendants having notified plaintiffs that they would neither accept the remainder of the cattle nor allow plaintiffs to have the vouchers for any future deliveries upon which to get their pay, and never having withdrawn such notice, plaintiffs' right of action was complete without any further offer to perform, provided the cattle offered were of the condition and quality stipulated in the contract. Upon this question of fact the evidence is in irreconcilable conflict, plaintiffs' witnesses testifying that they were, and defendants' witnesses as positively that they were not, of such kind and condition. The question of fact having been submitted to the jury under instructions which we cannot condemn, though not, upon this question, as explicit as would have been desirable, an expression of our own judgment upon the effect of the testimony is uncalled for.

In the contract between Slavens and the government it was provided that the cattle furnished under it should have been at least 12 months in succession north of the south line of Kansas. This provision was adopted into, and made a part of, the contract between plaintiffs and defendants by force of the requirement that the cattle delivered under the last agreement should be of the kind and description mentioned in the first. The answer of defendants contained an allegation that "they are informed and believe" that the rejected cattle "had not been north of the south line of Kansas for twelve months, as required in said contract." If this allegation was a denial in respect to this particular condition of the averment of the complaint that plaintiffs had in all respects fulfilled the requirements and per-

formed the conditions of the contract, then this fact was in issue, and the burden was on plaintiffs. There was evidence upon which the jury might have found either way. They were instructed that the question was in issue, and that the burden was upon plaintiffs. Under these circumstances, if the jury were convinced we must be. After the trial the defendants moved for a new trial upon the ground of newly discovered evidence upon this particular question. Applications for a new trial on this ground are addressed to the discretion of the trial court, and they are not ordinarily regarded with favor. Baker v. Joseph, 16 Cal. 173; Arnold v. Skaggs, 35 Cal. 684. See, also, Haynes, New Trials, § 87 *et seq.* It affirmatively appears by the testimony of the Indian agent that the · government, on whose contract these cattle were designed to be and were used by defendants, raised no question as to the eligibility of these cattle on the account named, so that it would be difficult to see how defendants were in fact pecuniarily prejudiced by being denied another opportunity to prove that a fact existed which did not injure them; to prove a breach as against plaintiffs, which the government waived as to them. At all events, we cannot characterize the refusal of a new trial by the trial court as such an abuse of its discretion as would authorize us to reverse its action.

In conclusion we will only observe that there are a few very close questions in this case, and in one or two respects we should be better satisfied with the charge of the court if it were slightly different; but taking it as a whole, we think it presented the case to the jury upon a correct theory. Upon the evidence we think the plaintiffs were fairly entitled to a verdict for the value at the contract price of the 149 head of cattle delivered on the 13th of November, and interest on the same. The verdict rendered was but a slight increase over this. Upon what particular ground or claim of plaintiffs this excess was given, we have no means of knowing. The evidence was such that it might have been given upon either. We do not find any

error in the record requiring a reversal, and the judgment of the circuit court is therefore affirmed.

FULLER, J., took no part in the decision of this case.