## SACRAMENTO SUBURBAN FRUIT LANDS CO. v. NELSON et al.

Circuit Court of Appeals, Ninth Circuit. December 17, 1929.

Motion for Modification of Opinion Denied January 13, 1930.

No. 5683.

Butler, Van Dyke & Desmond, of Sacramento, Cal., and Arthur C. Huston, of Woodland, Cal., for appellant.

Ralph H. Lewis and George E. McCutchen, both of Sacramento, Cal., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. This is a companion case to Sacramento, etc., v. Melin (No. 5671) 36 F.(2d) 907, to which reference is made for a general statement of the situation involved in this case.

The appellants asked the court to give the following instruction:

"The law presumes that a person is innocent of crime or wrong; that private transactions have been fair and regular; that the ordinary course of business has been followed.

"The presumption against fraud on the part of defendant must be overcome by the plaintiff.

"The evidence must amount to proof of fraud, and not a mere suspicion thereof."

This request was refused, and exceptions noted to the refusal. On that subject the court instructed the jury as follows:

"Coming now to the nature of the case which is that of fraud, of deceit, the rule of law is in the first place that transactions between men dealing in a business way are presumed to be fair and regular; but, of course,

you might see in the evidence reason to believe in any case, and in this case, why the defendant is not entitled to that presumption. However, it is a matter dependent upon proof in the case, the greater weight of the evidence and your judgment.

"Fraud is never presumed. It might, however, be inferred from the evidence in the case, the circumstances. It is not necessary, to make out a case of fraud, to prove that the defendant and its agents deliberately made up their minds and announced they were going to cheat plaintiffs; not at all; you would never find such a case; in the cases of fraud, it is worked secretly and underhandedly, so far as disclosing intent to defraud is concerned. The intent may be manifested by the representations, the actions of the defendant. You infer a man's intent from what he says; you cannot see into his mind. So in the case of a corporation that acts only by agents, if there is any evil intent you infer it from the agent's representations and the like, and ask yourselves whether it is just to infer, or not."

While this instruction covers in a general way the ground covered by the proposed instruction, it is erroneous, for by it the jury were informed that they might conclude from the evidence that the defendant was not entitled to the presumption of innocence and fair dealing. The presumption of innocence and fair dealing is of universal application. No one is ever to be deprived of the presumption as a matter of law or because a jury may decide that the person is not entitled to the benefit of the presumption.

In addition to the foregoing error, which requires reversal of the judgment, the trial court made extended comments on the testimony of the witness C. G. Hopkins, who testified for the defendant. This witness, on direct examination, testified as follows:

"I am an attorney at law, practicing in Sacramento, and have been living in this county for thirty-three years. I am the owner of a parcel of land in the Arcade district on the Haggin Grant. It is probably about two and a half miles south of the Rio Linda district, and about a mile or so east of the land owned by Mr. Morley. I have thirty acres. The depth of soil on my property varies from about a foot to three feet. There may be spots where it is a little deeper. The entire thirty acres is planted to orchard. I have been planting that orchard since about 1914, about five acres a year, and so on, until it is all planted. The oldest trees I have are almonds, and about thirteen acres of prunes. The trees are about six or seven years old. It was blasted for all of the trees before planting. I did not find any great mortality among trees for the first year or so. Very little of the young trees died. I have given them very good care for the last five or six years. I have cultivated, plowed and harrowed them, and irrigated them to a very great degree. I have almonds, prunes, and some peaches, and also oranges. I consider they have made a very splendid growth. They are large trees for the time they have been in the ground. My prunes have produced splendidly in the last two years. I estimate the crop in my prune orchard this year to be nearly a ton an acre, dried.

"Four acres of my almonds always do very well. On six acres I have intermittent crops. They are about the same varieties. On the six acres that have not produced, the almonds are Nonpareils and Drakes. I attribute their failure to produce to pollenization. I have had a very satisfactory return on the four acres that have produced. I have no estimate of the quantity. As to failure of the crop on those six acres, I probably need fertilization, which I have attempted to give them.

"I have had very good crops of peaches for the age of the trees. They are about five and six years of age. They have not come into full bearing.

"Q. How about the quality and size of the fruit? A. Very fine fruit, Tuscan peaches, cling peaches.

"I have very large trees on four acres of olives. I cannot be proud of the production, because my olives have not been good the last three years. The olive trees vary from twelve years down to five or six. Before the last couple of years when the crop has not been good, I had some good crops off the trees before that. Climatic conditions are the factor for the failure of that crop in the last two years. That has been general throughout the Valley over this section of the state in this county. In my opinion, there is nothing in the soil, *as depth* or quality, to which I attribute the failure of the olive crop.

"I have about seventy large orange trees. I had a good crop every year, very fine fruit, of good quality."

It will be noted that on his direct examination he testified to the facts concerning his cultivation of this thirty-acre tract in the Rio Linda district. He was not called upon in his direct examination to give any opinion concerning the commercial fruit-bearing possibilities of the soil. The only thing in the nature of an opinion ventured by him in his direct examination was the following:

"In my opinion, there is nothing in the

soil, as depth or quality, to which I attribute the failure of the olive crop."

The cross-examination of this attorney at law was apparently conducted in, and replied to, in a jocular vein. The cross-examination is as follows:

"I am an attorney at law in Sacramento, and have been in that occupation for more than thirty years. I care for these trees myself pretty largely.

"Q. I suppose you have been making a lot of money out of that enterprise? A. I get a lot of exercise out of it, a lot of fun out of it.

"Q. In that way do you consider it profitable; is that right? A. I consider it profitable up to date.

"Q. From an exercising standpoint? A. I take that into consideration, too."

In view of the part of the charge presently to be quoted, it should be noted that, although the question was asked of the witness whether he considered his operations profitable because of the exercise he got out of it, his first answer ignored that factor, and the second answer merely stated that he took that into consideration in arriving at his conclusion that it was profitable. There is no indication in his cross-examination that he considered the ranch profitable solely and only because of the fact that it offered an opportunity for exercise. On the contrary, he testified up to that point fully with regard to his operations. It was apparent also that, under his policy of planting out five acres each year, he may not have made an actual money profit during that period.

The court instructed the jury, with reference to Mr. Hopkins' testimony, as follows:

"Furthermore, in the matter of commercial orcharding, the defendant introduces witnesses in respect to their operations, among them Mr. Hopkins. Mr. Hopkins has done considerable orcharding about 2½ miles from there, from this land; he has 30 acres. He says he has been planting his orchard since 1914. He tells you what he has, prunes, 6 and 7 years old, that he blasted every tree, two or three sticks of powder, and he said a few died. He gave very good care to them, and says that they produced splendid prunes for the last two years, a ton to the acre, dried; he does not say how much he got for them, or whether that is a profitable crop or not. He had almonds on four acres that did very well, satisfactory return, but could not estimate the return; peaches very good for five or six years of age. I think he said that was hardly the bearing age yet. He said fine fruit, but he does not state anything about the return. About the olives he said he could not be proud of the crop for the last 2 or 3 years—they are 12 years old—that he had some crops on them before that but he imputes the failure of the last two or three years to some climatic condition which defeated pollenization. Then he testified on cross-examination that he was an attorney at law in actual practice. When he was asked if he made any money, he said it was profitable because of the exercise it gave him. That might be true; a man might recover his health working on a piece of land that was a dead loss, so far as money was concerned, and that is the best Mr. Hopkins has stated about his return from the standpoint of profitableness. The fact that he said it was profitable because of the exercise it gave him would not bring it up to the dignity of a commercial orchard. That is no evidence that the land is commercially profitable, because you can recover your health by working on it. He might not raise a dollar of stuff and yet the exercise might have kept him in good health and training; but a commercial orchard would be a different thing. To be a commercial orchard it must be one that is so suitable in soil and climate and other conditions, that through a series of years with reasonable care and attention it will produce crops in such reasonable amount that under reasonable market conditions it will prove profitable, as I have heretofore defined to you, to the extent that it will live long enough to discharge the overhead when the land was unproductive and when the orchard came to maturity and through the life of the orchard and until it finally died, so that upon the whole the venture has been a profitable one."

This instruction is not only unfair in its general purport, but it misstates the evidence of the witness Hopkins as follows: "He said it was profitable because of the exercise it gave him. * * * He might not raise a dollar of stuff, yet the exercise might have kept him in good health and training, but a commercial orchard would be a different thing." In view of the fact that the witness had testified that he had produced a ton of dried prunes per acre from his prune orchard, this observation was obviously unfair. An even more objectionable feature of this instruction is the definition given of a commercial orchard. The representation made by the defendant concerning the possibility of raising fruit commercially is a representation of a material fact so far, and only so far, as it is a representation of an

existing condition and that condition is the fertility and depth of the soil.

The definition given by the court of a commercial orchard, while it may be correct as an abstract proposition, as applied to the facts in this case, converts the representation concerning the commercial fruit-raising possibility of the land into one of opinion upon which an action for fraud cannot be predicated. In arriving at a conclusion under this instruction, the jury are required to speculate as to what will be market conditions over a long period of years, upon the length of life of the trees, upon what constitutes reasonable care and attention during the life of the trees, and upon this basis to determine whether or not a material fact as distinguished from an opinion was misstated by the defendant as an inducement to the plaintiff to purchase the land in question. The real question involved in the case is whether or not the land is so devoid of plant food and so underlaid with an impervious hardpan, that it was not adapted to raising fruit for the market as distinguished from the raising of fruit for family use.

Judgment reversed.