STATE ex rel. MARY A. MOSELEY et al. v. W. A. JOHNSON,
admr. of W. N. PEDEN, THE UNITED STATES FIDELITY AND
GUARANTY COMPANY et al.

(Filed 3 April, 1907).

1. **Trial—Argument—Improper Language of Attorneys—Duty of Judge.**—It is the duty of the trial Judge, when objection is made to language used by attorneys in their argument to the jury as improper, to note down the language at the time, with the exception, to avoid any question thereafter.

2. **Same—New Trial—Exception.**—Improper and reprehensible language, uncorrected by the trial Judge, is ground for a new trial; but when it appears from the inspection of the record that the findings of the jury were fully justified by the evidence and practically the same as the conclusions of three referees before whom the case was heard, and that a new trial would probably result in similar conclusions, this Court will exercise a sound discretion as to granting a new trial.

3. **Issues Submitted Sufficient—Issues Tendered.**—Exceptions to issues which cover every phase of the case, giving opportunity to present evidence of every defense relied on, cannot be sustained, though an issue was tendered and refused which would have better presented the contention upon a certain phase.

4. **Evidence Sufficient—Confidential Agent—Dealings—Fraud Presumed.**—When it appears that an administrator who claims property of his intestate by purchase or gift from his intestate had acted as his confidential agent prior to his death, that his intestate was a feeble old man at the time of such purchase or gift, and confided to his management his estate, the burden is on the administrator to show a full and sufficient consideration, if claimed by purchase, and that his intestate knew what he was doing, had capacity to understand it, and that no undue influence was exercised by him, if claimed by gift.

5. **Order of Reference—No Exception—Judge's Discretion.**—A plaintiff who does not except to an order of reference is not entitled as of right to a jury trial upon his exception to the findings of the referee, but he is entitled to have the Judge below review the findings, and, for his own information, the Judge may, in his sound discretion, submit the question to the jury, especially where the facts depend upon doubtful and conflicting testimony.

144—17

MOSELEY *v.* JOHNSON.

6. **Administrator—Sale of Securities—Value—Evidence.**—When an administrator has sold certain securities of his intestate, the value of such as evidenced by the sale is not conclusive, and evidence of market quotations at different times and testimony of witnesses thereof are competent to go to the jury upon the question of their real value; and it is not error in the Judge below to admit as evidence of market quotations those appearing in a daily news-paper published in the State of the corporate securities wherein they had a market value.

7. **Sureties—Liability—Solvency of Principal.**—The liability of a surety upon an administrator's bond for his individual debt to his intestate, incurred prior to his death, depends upon the solvency of the administrator at the time of his qualification. In the event of solvency, the administrator is charged with his per-sonal obligations as a cash asset, and the sureties can only be relieved by establishing the continuing insolvency of the adminis-trator during the full period of his administration. For the ad-ministrator to avoid official liability, the burden of proof is on him to show his insolvency and total inability to pay.

8. **Same—Evidence.**—A written statement of his financial condition, made by the administrator to the sureties prior to the execution of the bond, showing solvency, is proper to go to the jury with docketed judgments in the administrator's favor and other evi-dence of the extent and value of his estate.

9. **Administrator's Account — Item not Chargeable — Correction.** When it appears that the administrator, under the verdict of the jury, has been properly charged with all disputed items except one, and there was no definite evidence to sustain this item, it will be deducted from the sum total, and the judgment below affirmed.

10. **Consideration of Prayers for Instruction—No Error in Charge.** When prayers for special instruction are presented to the Judge in apt time, his refusal to consider them is error, even if adjourn-ment is necessary to give time therefor; but a new trial will not be granted when it appears from the charge given that there was no error of which either party had just cause of complaint and that the prayers were substantially given.

11. **Demurrer—Answer—Waiver.**—When a defendant interposes a de-murrer to the complaint, which does not appear to have been acted upon, all rights thereto are waived by the subsequent filing of an answer.

MOSELEY *v.* JOHNSON.

DEFENDANTS' APPEAL.

THIS ACTION is brought by the relators, certain of the distributees of W. N. Peden, against the administrator of said Peden and the surety on his administration bond, the United States Fidelity and Guaranty Company, for an account and settlement, and to recover the sum due each distributee. Those of the distributees who are not parties plaintiff are made defendants. The cause was referred upon motion of plaintiffs to three referees, to which order defendants duly excepted in apt time. The referees reported at length, and find a balance due by the administrator of $31,265.20, 7 August, 1905, to which report the defendant, the administrator and surety company, filed numerous exceptions, demanded a trial by jury of the issues raised by the exceptions and tendered along with their exceptions certain issues arising thereon.

The cause came on to be heard before his Honor, *Jones J.,* at October Term, 1906, of the Superior Court of SAMPSON County, who submitted the following issues to the jury, to-wit:

1. When did James A. Peden die? Answer: September, 1894.

2. When did W. N. Peden die? Answer: 21 November, 1895.

3. When did the defendant W. A. Johnson administer upon the estate of W. N. Peden and file his bond with the United States Fidelity and Guaranty Company, as surety? Answer: 8 November, 1897.

4. Did the defendant W. A. Johnson, prior to the time of his administration, receive from W. N. Peden, as attorney in fact and agent of said W. N. Peden, the choses in action, cash, notes, bonds, stocks, debentures, coupons and other evidences of debt devised and bequeathed to W. N. Peden by

James A. Peden; if so, when? Answer: Yes; 18 or 19 October, 1894.

5. If so, did W. A. Johnson, as such agent and attorney in fact, retain the custody, control and management of said securities from their reception during the lifetime of W. N. Peden and up to the time he administered upon the said estate? Answer: Yes.

6. What was the cash value of choses in action, bonds, stocks, notes, checks, cash and coupons inventoried by the defendant W. A. Johnson? Answer: $38,045.19; $37,245.-19; interest on Ocean Steamship bonds, $800.

7. What was the value of the personal property, cash, choses in action, which went into the hands of W. A. Johnson, as attorney in fact and agent of W. N. Peden, and which were omitted from the inventory filed by the defendant? Answer: $20,424.

8. Was the proceeds of the sale of the bonds of the Lehigh and Wilkesbarre Coal Company collected by W. A. Johnson and turned over or paid out under the direction of W. N. Peden during his lifetime? Answer: Yes.

9. Was the payment of the $2,888.70 to F. C. Sollee by W. A. Johnson made by consent and direction of W. N. Peden? Answer: Yes.

10. Was the disbursements other than to the distributees as appears on the inventory and return of W. A. Johnson's administration to the clerk proper and just? Answer: Yes.

11. What amount has the defendant W. A. Johnson retained as commissions? Answer: $2,135.45.

12. Did the intestate W. N. Peden, prior to his death, sell and convey or give to W. A. Johnson the Chicago and Rock Island Railroad bonds, $11,000, and the Chicago, Milwaukee and St. Paul Railroad bonds, $3,000? Answer: Yes.

13. Did the intestate W. N. Peden sell and convey or give

to W. A. Johnson the $4,500, United States bonds? Answer: No.

14. What amount, if any, of interest on notes and bonds, debentures and stock inventoried by W. A. Johnson did said Johnson receive and fail to return? Answer: Nothing.

15. Was the defendant W. A. Johnson solvent on 8 November, 1897, at the time he took out letters of administration? Answer: Yes.

16. If the said W. A. Johnson was solvent on 8 November, 1897, what was he worth in excess of his personal property exemptions, homestead and other liabilities? Answer: $30,000.

17. What amount has the defendant W. A. Johnson, administrator, paid to the respective distributees of said estate? Answer: To Mary A. Moseley, $4,350; Anna C. Johnson, $2,500; Ida C. Hubbard, $6,000; W. M. Peden, $1,000; Howard Peden, $1,600; Bettie F. Miller, $250; W. H. Peden, $600; Martha A. Peden, $715; Mary E. Hall, $700; Anna C. Anderson, $1,650; Madge Faison, $250. Total, $19,615.

18. What amount was the defendant W. A. Johnson indebted to the estate of W. N. Peden at the date of his administration for property converted and not returned in his inventory? Answer: $20,720.

19. In what amount are the defendants indebted to the plaintiffs? Answer: $36,768.74, now due estate of W. N. Peden.

From the judgment rendered by the Superior Court, the defendant Johnson, administrator, and his surety on the administration bond appealed to this Court.

*Stevens, Beasley & Weeks* and *George E. Butler* for plaintiffs.

*John D. Kerr, F. R. Cooper* and *A. C. Davis* for defendants.

BROWN, J.  It would extend this opinion to a most un-
reasonable length for us to consider *seriatim* the eighty-six
exceptions to the rulings of the Court below and would be of
no practical value; therefore, we will group the principal con-
tentions under appropriate heads.  The exceptions that have
given us most trouble are those directed to certain objection-
able language used by counsel for plaintiffs in addressing
the jury.  The language is set out in the case on appeal, to-
gether with the defendants' exceptions thereto, and it appears
therein that his Honor permitted the objectionable language
and argument to go to the jury unrebuked.  We are left some-
what in doubt as to what actually transpired by another
statement in the case on appeal (which appears to have been
made up by the Judge), as follows: "In reference to the
15th and 16th exceptions of the defendants, the Court does
not recollect that the language was used by plaintiffs' attor-
neys.  There were objections to the arguments while Court
was busy writing the charge that consumed many hours.
The discussion and argument was very warm and heated on
both sides and much latitude was allowed on all the argu-
ments, and Clerk will insert this statement of the Court im-
mediately after and in connection with exceptions 15 and
16."  In this connection we will remind the Judges of the
Superior Court that, when objection is made to language used
in the course of the argument, it is their duty to stop the
discussion and take it down and then and there note the
exception, so there can be no question made afterwards
as to what actually transpired.  If the language alleged to
have been used on the argument of the case before the jury
is correctly stated, it was exceedingly reprehensible, and
if the able Judge who tried the case permitted it to go un-
rebuked he committed an error, and one to be deplored.  In
this connection we call attention to the forcible comments

of *Mr. Justice Walker* in the opinion in *Hopkins v. Hopkins,* 132 N. C., 28, as to the duty of the Court and attorneys. That is a case in which a new trial was granted because counsel overstepped the limits of propriety, and were permitted to do so by the Court over the appellants' objection. We would feel compelled to grant a new trial in this case because of such error were we not fully convinced that the defendants have not been at all prejudiced thereby, assuming that the objectionable language was used, which seems to be left in doubt by his Honor's statement. The case was tried by three referees and again by a jury, and practically the same conclusions reached in both trials. Nineteen issues were submitted to the jury, who found for the defendants on several, one of them involving over fourteen thousand dollars, upon which they might well have found for plaintiffs. A careful examination of the evidence convinces us that the findings of the referees and the jury were fully justified by the evidence, and that a new trial would undoubtedly result in a similar conclusion. Under the circumstances, we feel that the plaintiffs ought not to be put to the great expense of another trial on account of the alleged indiscretion of their attorneys.

The exception as to the issues cannot be sustained. Those submitted appear to cover every phase of the case, and under them the defendants had opportunity to present evidence of every defense relied upon. The form of the issues is of little consequence if the material facts at issue are clearly presented by them. *Paper Company v. Chronicle,* 115 N. C., 147; *Fleming v. Railroad,* 115 N. C., 676.

It appears that James A. Peden died in Florida in October, 1894, possessed of a large personal estate, consisting of stocks and bonds, which passed under his will almost entirely to his brother, W. N. Peden. The referees find, and

the evidence tends strongly to prove, that W. N. Peden, deceased, and William A. Johnson went to Florida on 12 October, 1894, immediately after the death of James A. Peden, and there passed into the hands of William A. Johnson, as agent and attorney in fact for W. N. Peden, the following stocks, bonds and securities, received by him from Francis C. Sollee, curator of the estate of James A. Peden, and from various depositories in Florida and Georgia: Eleven bonds Chicago and Rock Island Railroad Company, $11,000; three bonds Chicago, Milwaukee and St. Paul Railroad, $3,000; bonds Lehigh and Wilkesbarre Coal Company, $5,000; bonds United States Government, $4,500; bonds of North Carolina, $2,600; bonds Ocean Steamship Company, $1,000; City of Savannah Bonds, $4,000; certificates National Bank of Florida, $2,000; certificates Merchants Bank of Savannah, $400; certificates Southwestern Railroad of · Georgia, $7,900; certificates Atlanta and West Point Railroad, $2,800; debentures Central of Georgia Railroad, $9,200; cash in bank at Savannah, $2,800; debentures Atlanta and West Point Railroad, $6,100. That all of the foregoing property was delivered into the hands of William A. Johnson, as agent of W. N. Peden, from Francis C. Sollee, curator of the estate of James A. Peden, and from various depositories in the States of Georgia and Florida. That, in addition to the property set out in the above finding of fact, there was delivered to the said W. A. Johnson certain stocks of the Clinton Loan Association, and certificates of deposit in the same, amounting in all to about the sum of $15,000 par. That at the time of the delivery of said stocks and securities to William A. Johnson in November, 1894, dividends had been declared and interest had accrued on the same which had not been collected by James A. Peden and F. C. Sollee, curator; and dividends were after-

wards declared and interest accrued on the same, all of which was collected by William A. Johnson, as follows: United States bonds, accumulated interest in 1896, $180; North Carolina bonds, one dividend, December, 1894, $104; City of Savannah bonds, 1894-1895, $205; National Bank of Florida, 1894, 1895, 1896 and 1897, $600; Merchants Bank of Savannah, 1894, 1895, 1896 and 1897, $74; Atlanta and West Point Railroad, 1898, dividends, $588; debentures in same, interest to 1898, $1,281; Southwestern Railroad of Georgia, stock dividends, 1897-98, $1,643; Ocean Steamship bonds, 1894-1904, $550.

W. N. Peden died intestate on 21 November, 1895, and on 21 September, 1897, defendant Johnson qualified as his administrator, with the defendant company as surety on his bond in the penal sum of $30,000. On 8 February, 1898, the administrator filed his inventory, setting forth the assets which he avers belongs to his intestate's estate. A number of the securities received from James A. Peden's curator were not included in the inventory; they or the proceeds thereof being claimed by the administrator as his property. In the report of the referees and on the trial in the Superior Court, the defendant, administrator, has been charged with some items which he contends he is not liable for and which the surety company contends it is not liable for as surety. These disputed items are as follows: North Carolina State bonds, $2,600; United States bonds, $4,500; City of Savannah bonds, $4,100; Ocean Steamship Company bond, $1,000; debentures Georgia Central Railroad Company, $9,200; note of W. A. Johnson, $2,000; note of W. A. Johnson, $684.20; cash in some bank, $2,800; dividends and interest. The controversy over the first three of said disputed items is as to their ownership. The controversy over the 4th, 5th, 6th and 7th of said disputed items is as to

their value. The controversy over the 8th of said disputed items is as to its existence. The controversy over the 9th of said disputed items is as to amount thereof, and that depends entirely upon the disposition of the preceding items. It is contended by the defendant, administrator, that the 1st, 2d and 3d items became his property during the lifetime of his intestate, and that he is not properly chargeable with them as administrator. The defendants tendered a specific issue as to the ownership of these bonds, and excepted because his Honor did not submit it. We think it might have been better to have submitted the specific issue, but we also think the controversy was fully presented and cognizable under the seventh issue. The learned counsel for the defendants earnestly contend that there is no evidence whatever upon which the administrator can properly be charged with the value of such bonds. In the view we take, there is a presumption of law which puts the burden of proof upon Johnson that he acquired title to these bonds fairly during the life of his intestate, and which requires him to show that such acquisition was not fraudulent. If he failed to so satisfy the jury, the verdict was properly rendered against him. There is abundant evidence tending to prove that when James A. Peden died Johnson accompanied W. N. Peden to Florida as his confidential agent and friend; that all the securities were turned over to Johnson for W. N. Peden; that W. N. Peden resided in Clinton, N. C., and William A. Johnson lived in Wilmington, N. C., and that all the stocks, bonds and securities hereinbefore enumerated were kept by William A. Johnson in his private safety deposit boxes in Wilmington, N. C., and Savannah, Ga., none of which ever went into the hands of W. N. Peden after 16 November, 1894. It further appears in evidence that Johnson sold the Savannah and North Carolina bonds

through J. V. Grainger prior to 1 November, 1895, and had the proceeds credited in the Murchison Bank to his individual account. The evidence tends strongly to prove that during the year 1895 W. N. Peden was in feeble health, and for several weeks prior to his death on 21 November, 1895, was confined to his bed, during which time William A. Johnson had the management of his entire property. It further appears that Peden did not owe any debts except the few credited to the administrator, and that even his funeral expenses were paid by two of his daughters. W. N. Peden lived only thirteen months after he received the large bequest his brother made him, and during that time the evidence tends strongly to prove that Johnson was in custody thereof as the general, confidential and trusted agent of his father-in-law, who was an old and feeble man. The evidence tends to prove, furthermore, that Johnson was rapidly converting a large part of the securities to his own use, although Mr. Peden had a large number of children and grandchildren whom he doubtless wished to become sharers in his estate. That the jury has not been in the least prejudiced against the defendants is plainly manifested by their finding on the 12th issue relating to the $14,000 worth of valuable railway bonds. They might well have found, and probably ought to have found, against the defendants upon that issue, as the evidence shows no such consideration as a court of equity requires to support such a transaction under the circumstances of this case. The sum of $100 is scarcely sufficient to support a sale of $14,000 in gilt-edged securities from a feeble old man to his confidential agent, who had them in custody. As this point was not raised on the trial and is not embraced in the plaintiffs' appeal, the defendants cannot now be charged with that item. We only mention it to show the character of one of the transactions disclosed by

the evidence and to emphasize the patent fact that the jury were not prejudiced against the defendants by the intemperate zeal of counsel.

There are certain known and definite fiduciary relations by which one person is put in the power of another which are sufficient to raise a presumption of fraud in respect to dealings between the two when it is shown that one has acquired the property of the other. In his oft-quoted opinion in *Lee v. Pearce,* 68 N. C., 87, *Judge Pearson* specifies four such relations, and among the four is that of general agent, viz., "where one is the agent of another and has entire management of his property." 1 Bigelow on Fraud (1890), p. 295; *Timmons v. Westmoreland,* 72 N. C., 587. "When a party complaining of a particular transaction, such as a gift, sale or contract, has shown to the Court the existence of a fiduciary relation between himself and the defendant, and that the defendant occupied the position of trust and confidence therein, the law raises a suspicion, or, as it is often said, a presumption of fraud—a suspicion or presumption arising as a matter of law that the transaction was effected through fraud." *Smith v. Moore,* 142 N. C., 296; 1 Bigelow, 261. Inasmuch as Johnson occupied such relation to Peden, and had special facilities for committing fraud upon him in respect to the securities which Johnson had control of, the law, "looking to the frailty of human nature," requires him to show that his action has been honest and honorable. If he claims the securities by purchase, he must show a full and sufficient consideration, and, if he claims them as a gift, he must show that Peden fully understood what he was doing, had capacity to understand it, and that no undue influence was exercised by Johnson to acquire them, and that it was Peden's full and voluntary act. Applying this just and well-settled rule of law, we are bound to conclude that no

error was committed by his Honor, the referees or the jury in charging the defendant with the three items named.

The controversy over the 4th, 5th, 6th and 7th items relates to their value only, as defendants admit liability for them. It is contended that there is no issue under which the value of these securities could. be determined, and that, therefore, the Court erred in not submitting the issue tendered by the defendants. These securities were returned by the administrator in his inventory, filed 8 February, 1898, and his liability for their value admitted. We think that it was competent to determine their value under the 6th issue, which is in express terms confined to the actual value of the assets inventoried by the administrator. As to item 5, Georgia Central debentures, the referees charged defendant Johnson with $1,081 as the value of these securities. The plaintiffs, and not the defendants, excepted to this finding. As the plaintiffs consented to the reference, and are not as a matter of legal right entitled to a jury trial upon the issues arising upon the exceptions, it is contended his Honor erred in submitting the value of these securities to a jury. Assuming, for the argument's sake, that plaintiffs were not entitled *as of right* to a jury trial, yet they were entitled to have the Judge review the findings of fact of the referees. While he could not accord plaintiffs a jury trial as a matter of legal right, he could for his own information, and in his sound discretion submit the question of the value of the securities to a jury. In *Maxwell v. Maxwell,* 67 N. C., 383, this subject is discussed by *Mr. Justice Rodman,* and it is held: "In passing on exceptions to the report, the Judge may cause issues to be framed and submitted to a jury, if the facts depend upon doubtful and conflicting testimony." See, also, *Rowland v. Thompson,* 64 N. C., 714; *Green v. Green,* 69 N. C., 294; *Gold Company v. Ore Com-*

*pany,* 79 N. C., 48. We think that in ascertaining the
value of these securities it was well within his Honor's dis-
cretion to submit the matter to the jury, and under the cir-
cumstances it was a natural and proper thing to do. In
this connection it is contended that his Honor erred in per-
mitting quotations from the market reports of the Morning
News, a daily newspaper published in Georgia, showing
quotations for these debentures and also of the Ocean Steam-
ship Company bonds, under date of 1 June, 1904. These
were Georgia corporate securities, and had a market value in
that State. In addition to newspaper quotations we find
also in the record evidence of witnesses as to the value of such
securities. The competency of such evidence is settled. In
this State it is held that market reports of such newspapers
as the commercial world rely on are admissible as evidence
of market values. *Fairley v. Smith,* 87 N. C., 367; *Sisson
v. Railway Co.,* 14 Mich., 496; 3 Wigmore on Evidence,
sec. 1704; 1 Elliott on Evidence, sec. 419. The plaintiffs
were not compelled to take the sale, alleged to have been
made by the administrator, at the time he made it as con-
clusive evidence of value. They were entitled to prove the
market quotations of value at different times, so as to enable
the jury to arrive at a just estimate as to the real value of
these securities. *Smith v. Railroad,* 68 N. C., 107.

This brings us to item 6, the notes the administrator owed
to his intestate, and to the consideration of the solvency of
the administrator at the time he qualified as such. The
liability of the surety company for the notes Johnson owed
Peden, as well as for the securities which Johnson is charged
with appropriating before his qualification as administrator,
depends upon the fact as to whether, at the time Johnson
qualified, he was solvent and able to make good his personal
obligations to his intestate's estate. If an administrator

seeks to be discharged from his official liability for an ante-
cedent obligation to his intestate on account of insolvency
and total inability to pay the same, the burden is upon him
to establish that fact. *Howell v. Anderson*, 61 L. R. A., 315.
In the exhaustive note to this case all the authorities are
collected. The administrator is charged with his own per-
sonal obligation as a cash asset in hand, and he and his
surety can be relieved only by establishing the fact that the
administrator at the time of his appointment was hopelessly
insolvent, was so during all the time of his administration,
and remained in that condition up to and including the time
of his final settlement. *Howell v. Anderson, supra.* Inas-
much as one who is administrator cannot sue himself, it is
but just that he should be required to account to the estate
for his individual obligation as so much cash, unless he can
establish the fact of his inability to pay. This is a salutary
rule, and one which meets our full approval, and is the only
practical way of solving an otherwise difficult problem.
Upon the question of the solvency of Johnson, embraced in
the 15th and 16th issues, the plaintiffs offered the state-
ment of Johnson, dated 21 September, 1897, made to de-
fendant surety company, when he applied to it to become
surety on the administration bond, to which defendants ex-
cept. In it Johnson sets out the character and value of his
estate over and above all liabilities as follows: Real estate
$10,000; personalty $15,000, and $10,000 notes and secur-
ities, all of which he states are unencumbered. This appli-
cation was accepted by the defendant company and acted
upon favorably. The fact that after the investigation of
the facts contained in the application the company became
his surety is evidence that its officials regarded Johnson
as perfectly solvent; and as to Johnson, it is elementary that
the statement is evidence against him. The number of

docketed judgments in Johnson's favor offered by plaintiffs was competent along with evidence of the extent and value of his estate.  The fact that some of them were worthless goes to the value of the evidence and not to its competency. As these issues relating to insolvency have a most important bearing upon the liability of defendant company for a considerable part of the judgment rendered, we have examined the evidence and exceptions relating thereto with care.  There are so many of them that we will confine ourselves to saying that we find in the ruling of his Honor on them no reversible error—nothing which would justify us in ordering a new trial.  The evidence fully warrants the finding of the referees and of the jury that Johnson was amply solvent when he qualified as administrator.

The 9th item of dispute relates to dividends and interest received by Johnson.  It is admitted that its disposition depends upon the disposition made of "said items" in dispute. We hold that Johnson has been properly charged with all the disputed items except the 8th, being itemized as "Cash in some bank, $2,800."  We are unable to find any definite evidence to support this charge, and we therefore sustain that exception.

In regard to the contention that the penalty of the administration bond does not bear interest, we fail to see that any such ruling has been made by his Honor.  The amount of the recovery against the administrator personally exceeds the penalty, and therefore the judgment against the defendant company is for the full penal sum of the bond and for no more.  This penalty bond is then merged in the judgment, and it is the latter which bears interest from the date of its rendition until paid.

The defendants except because his Honor neglected to consider their prayers for instruction—ten in number.  The

Judge made the following indorsement on them: "Prayer of defendants for special instructions. The evidence in this case closed one evenng about 5:30; the jury was excused from the court-room until morning. The defendants in apt time requested the Court to put its charge in writing and read same to the jury. An argument of one-half hour was made to the Court upon the issues. Court adjourned till morning, and, when convened, defendants handed up the enclosed special instructions. The Court reduced its charge to writing and has not had time to examine the special instructions, and therefore does not give them except as they appear given in the written charge, which consumed Court's entire time allotted for work and sleep." The requests for instructions were handed up in apt time and it was error in his Honor not to consider them. *Craddock v. Barnes,* 142 N. C., 89. If necessary, the Judge should adjourn Court in order to weigh and consider the prayers for instruction. We have carefully examined the charge, however, and find that his Honor gave very full and clear instructions upon almost every phase of the case, and gave defendants all they were entitled to. We find no error in the charge of which either party has just cause to complain.

The demurrer interposed by defendant Johnson, individually, to the complaint does not seem to have been passed upon at any time by the Court. If it were meritorious, which we fail to see, it was waived by both defendants filing an answer before the demurrer had been acted upon. *Ransom v. McClees,* 64 N. C., 17; Clark's Code (3 Ed.), sec. 242.

Upon consideration of the whole case, we are of opinion that it has been ably and fairly tried, and that there is no error except as to the 8th item of dispute, $2,800. This should be deducted from the judgment of $36,768.74 rendered against defendant Johnson, and, with that deduction,

the judgment against him is affirmed. The judgment for $30,000 against the defendant the United States Fidelity and Guaranty Company is not affected by such error, and that judgment is affirmed. We direct that all the cost of this Court on the defendants' appeal be taxed against defendants Johnson and the United States Fidelity and Guaranty Company.

Affirmed. ————

SAME CASE——PLAINTIFFS' APPEAL.

1. **Administrator's Bond—Sureties—Interest.**—Under Revisal, sec. 1954, interest cannot be charged sureties on the penalty of an administrator's bond.

2. **Assignment of Interest in Suit—Attorney of Adverse Party of Record.**—Certain parties to a suit cannot be heard to attack the assignment of other parties to the suit of their interest therein to an attorney of record of the opposing parties, when it does not appear that their interests are in any way affected.

BROWN, J. This is the plaintiffs' appeal in the cause above entitled and disposed of at this term. The opinion of the Court in the defendants' appeal is referred to for the facts of the case.

The plaintiffs except and appeal:

1. Because the Court below refused to charge the defendant the Fidelity and Guaranty Company with interest on the $30,000 penalty of the administration bond from 7 January, 1902, the date of the original summons in this action. We have touched briefly on this matter in considering the defendants' appeal, and held that the Superior Court properly allowed interest on the $30,000 from the date of the rendition of the judgment against the surety, not because interest is ever allowable upon a mere penal obligation, but because when judgment is rendered for the full amount of the penalty, as in this case, the penalty becomes merged in