## HARRIS et al. v. UNITED STATES.
### No. 6283.

Circuit Court of Appeals, Ninth Circuit.
March 30, 1931.

John L. McNab, George N. Crocker, and Louis L. Jaffe, all of San Francisco, Cal., for appellant.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

The appellants, Harold Harris and Meyer Morris, appeal from a judgment and sentence imposed for a conspiracy to defraud and for the use of the mails to defraud. They were jointly indicted with Daniel A. Levy, who was convicted and has not appealed, Walter D. Forsyth and Ernest R. Heath, who were tried and acquitted, Samuel C. Sugarman and Earl Sacks, who were not tried, and Ward Williams and Charles L. Gillis, against whom the case was dismissed. The indictment contained six counts. One count was dismissed, appellants were convicted on each of the remaining five counts and sentenced to thirteen months' imprisonment upon each count, the sentences to run concurrently, and to pay a fine of $500.

The fraudulent scheme alleged, and developed by the evidence, was one for the sale of the stock of the General Mining, Milling & Power Company, a corporation organized under the laws of the state of Delaware with offices in New York City. It appears from the evidence that certain mines in the Mogollon mining district, N. M., known as the Mogollon mine, had been operated more than twelve years and had produced gold and silver valued at over $7,500,000. In 1926 practically all the known ore bodies had been exhausted. The equipment of the mines was removed in 1926–1927. The mining property was subsequently sold to W. A. Cochrane of New York, and was thereafter acquired by the General Mining, Milling & Power Company, whose stock is involved in this case. After 1927 apparently other exploratory work was undertaken so that E. D. Godfrey, a mining engineer who had worked on the property from October, 1924, until January, 1926, and who, under the employment by the General Mining, Milling & Power Company, was familiar with the situation in the latter part of 1928 and the first part of 1929, was able to state that in his opinion the value of the property and the equipment of the General Mining, Milling & Power Company, which will hereinafter be referred to as "the company," was $275,000. It was capitalized for $3,500,000. In the latter part of 1928 and first part of 1929, this witness estimates that there were approximately 1,392,000 tons of ore available in the company's mines at Mogollon; that the average value of this ore was $4.48 per ton, and that the average cost of removing the ore from the mines was between $5 and $6 per ton, so that an attempt to mine the entire ore body would result in a loss. There was, however, about 480,000 tons of this ore estimated to carry about $7.89 per ton. The gross value of this ore is $3,700,000, and the net profit in mining the same would be about $900,000, but before the ore could be mined at a profit it would be necessary to invest about $350,000 in capital. If this statement of the corporation's mining engineer is correct, the value of the stock is about 7 cents a share, and it would be necessary to spend more than that amount per share in order to operate the plant successfully. By the expenditure of this additional amount ($350,000) the total amount invested would be $625,000, the total amount to be realized by the mining of 480,000 tons of ore would be $900,000, which would represent $275,000 more than the total investment, which would be 7 cents per share, or, to put it differently, people who purchased stock at 7 cents a share could, by obligating themselves or their company for indebtedness of slightly more than 7 cents per share, hope to recover the investment, plus the additional outlay, plus an amount equivalent to the original outlay. In other words, the stock had a potential value of 14 cents a share which could be realized by the expenditure of the large amounts of money needed to actually recover the values from the mine. In this brief statement we omit reference to the values of machinery, etc., which would be on hand at the conclusion of the operations.

Defendant Levy entered into a contract with Ward Williams wherein Williams, who claimed to have an option on stock of the corporation, gave an option to Levy for the purchase of 1,000,000 shares of the stock of the company at 40 cents per share. One hundred thousand shares of this stock was to be purchased before December 1, 1928, 100,000 before January 1, 1929, and 200,000 shares monthly thereafter. The option was to expire if the minimum amount specified was not purchased and paid for within ten days after the date fixed for the completion of the purchase. Twenty thousand shares of this stock were turned over to Levy to cover expenses incurred in making the sales, the unexpended portion of which is to be returned in the event the 100,000 shares of stock were not sold. It was agreed that the balance of the stock of the company (2,500,000 shares) should remain unregistered and unissued until the fulfillment or cancellation of the agreement between Williams and Levy.

The fraudulent scheme charged in the indictment was one for the sale of this corporate stock at inflated values, by the manipulation of the price of the stock on the San Francisco Mining Exchange and the Spokane Mining Exchange and the circulation of false reports concerning the mine through the mails. To effect this scheme it is alleged that the defendants organized the stock brokerage concern known as the Pulp & Paper Securities Company, another known as the West Coast Finance Company, another known as L. F. Pearson & Co., all located in the Dexter-Horton building, in Seattle. At this juncture we will not attempt to distinguish between the activities of these concerns or the various defendants, but will refer to them all as defendants.

The defendants made arrangements by which they would report to the Spokane Mining Exchange alleged sales of stock. These sales were reported in the regular bulletins of the Spokane Mining Exchange and were wired back to the defendants to circularize thousands of prospective investors; that these daily market reports purported to show activity on the floor of the Spokane Mining Exchange. Although these reports covered thousands of shares of stock, the actual sales made on the floor of the exchange were confined to 100 shares sold by defendant Gillis to an outsider, who resold the same on the exchange to defendant Gillis, who purchased for the defendants. Arrangements were also made to have the stock listed on the San Francisco Mining Exchange. This was done

through defendant Forsyth. The method of operating in San Francisco was for Forsyth to give one broker a commission to buy a certain number of shares and another a commission to sell the same number. The purchase and sale price on the San Francisco Mining Exchange was fixed with reference to the prices furnished the Spokane Mining Exchange by the defendants. That is to say, the defendants sold and purchased their own stock on the San Francisco Exchange at the prices they had furnished the Spokane Exchange at the particular time of the sale and purchase. By this method of fixing the market price a steady rise from the initial price of $1 per share to the price of $2.30 per share was shown by the reports. The only difficulty with this scheme was the fact that purchasers of stock might desire to realize profits shown by the market returns, and, as there was no real market for this stock, it would require the defendants to repurchase this stock at the advance price shown by the market returns. This hazard was largely eliminated by the failure of the defendants to deliver to the purchaser the stock they had purchased by falsely representing that it would take two or three weeks to secure the certificates from New York, and also by attempts to dissuade the purchasers from selling the stock by representation that it was rising so rapidly in value that it would soon be worth $5 a share. By this means it was assured that very little stock would be offered by those who had purchased the only available stock from the defendants. In order to make it appear that the stock was very active on the market, the reports were manipulated so as to show a large number of sales daily. As these sales were all reported by the defendants to the exchange, of course they could be arranged in any manner that the defendants saw fit. But to save the telegraph tolls the defendants devised the scheme of reporting to the mining exchange a single block of stock as sold at a single price, and when they issued purported copies to prospective purchasers the stock was subdivided into blocks purporting to have been purchased by a number of purchasers. In order to maintain the price arbitrarily fixed in the office of the defendants, instructions were given to the brokers in San Francisco and Spokane to purchase all stock offered on the floor of the exchange. Reports and statements concerning the value of a mine and its prospects were prepared and mailed by the defendants to their prospective purchasers. Throughout these reports the idea is presented in various forms that these

properties had been continuously operated and are now being operated, and that they had produced $7,500,000 in values. In one circular it is stated that 1,500,000 tons of ore was blocked out and the value is given as $15,000,000, although, according to the engineer of the company, the value of the 1,500,000 tons was less than the cost of mining. It is stated that assays show values running from $6 to $130 per ton, and the average value was $15 per ton. It is estimated that 7,500 tons gross could be produced per annum, yielding a net profit of $750,000 per annum. Other misstatements were contained in the circulars mailed by the defendants, but they relied, in the advertisements and in their representations, upon the general proposition that here was an extremely attractive mine that had been in continuous operation for many years with large resources of ore, a completely equipped and operating plant, and a ready sale for its stock upon well-established mining exchanges at prices rapidly increasing in value. The man who was induced to buy the stock as an investment, and it was so represented, was thus assured that there was actual value behind the stock which would render him a fair profit on his investment, and the man who purchased for speculation was assured of a speedy turnover, whereas, in fact, there was no market whatever for the stock and there was no stock available for purchasers, except the small amount being manipulated by the defendants in the manner above stated. The evidence makes it perfectly apparent that as soon as the defendants withdrew their support from the artificially created market value of the stock it would immediately become worthless. That is to say, its intrinsic value of 7 cents per share would depend for realization upon a capital investment which there is little likelihood of securing, and, even if secured, this amount would be a small comfort to investors who had paid from $1 to $2.30 a share. That the scheme was one artfully designed to impose upon that portion of the public inclined to speculate upon market fluctuations of stock is obvious, and, when fortified by persistent representations of actual value exceeding the market value, the assurances of increased market value were well calculated to effect the object of the defendants. With this general statement of the facts developed by the evidence, we will proceed to consider the appellants' assignment of errors.

At the close of the testimony a motion was made for instructed verdict, and the failure of the court to instruct the jury to acquit the defendant was assigned as error. Appellants' contention is largely based upon the theory that, if the scheme alleged in the indictment and shown by the evidence was fraudulent, they were innocent participants therein. Both appellants took the stand and testified that they believed that the method of operations, so far as they knew it, was bona fide, and that they acted in good faith. We will not undertake to distinguish between the three organizations under which the defendants operated other than to say that the L. F. Pearson Company, as shown by the written agreement between the defendant Levy and the appellants, was one of copartnership. The primary purpose of this copartnership was to manipulate the stock upon the stock exchanges so that it would have an apparently steadily increasing market value. The appellants in charge of this scheme admit their purpose to create and maintain a stock market value by the method of reporting sales and by the purchase of stock offered for sale by any outsiders at the current market quotations. The defendants both testified that they believed the sales reported to them by Levy and Fitzpatrick, their codefendants, were actual bona fide sales made by them. They claim that as these sales were actually made or believed by them to have been made they were fully justified in reporting them as having been made upon the floor of the stock exchange, as this was in pursuance, they claim, of the usual practice. The jury were not required to believe the protestation of innocence of these defendants. In fact, the whole scheme centered around the establishment of an alleged stock exchange value which is in fact wholly fictitious. It appears that in reports of sales sent out by the appellants to prospective investors and to those who had already purchased stock, it was shown that 151,425 shares were sold on the Spokane Mining Exchange, whereas the only stock sold on this exchange was a block of 100 shares. The number of shares reported sold on the San Francisco Mining Exchange was 51,900 shares, whereas no shares were bought and sold upon that exchange. The actual number of shares sold by the defendants, according to their books, was 95,300 shares, while the total number of shares available for sale, that is, shares actually paid for by the defendants, was only 22,500 shares. It was part of the fraudulent plan, as alleged in the indictment and shown by the evidence, that certificates of stock for the shares sold were not to be delivered, if it could be avoided, and that purchasers should be persuaded to re-.

frain from selling. Both appellants were active in these endeavors.

Appellant Harris prepared a prospectus and letter for mailing to those on a selected mailing list. Without attempting to analyze these communications other than to point out that they convey the idea of a valuable mining property operated by an experienced and capable organization directed by responsible and honorable business men whose stock had a well-established market value which was rapidly increasing, and that the capitalization of the company was small compared to the assets, there is no suggestion in these communications that the mine had ever been worked out or abandoned or dismantled by its owners. These communications are as follows:

"In accordance with your request, I take pleasure in sending you, under separate cover, a booklet containing facts and data pertaining to the more permanent features of the corporation, such as financial structure, holdings, geology, and developments.

"The properties embraced in General Mining, Milling & Power Company holdings have already produced upwards of $7,500,-000.00 of gold, silver, and copper. Ore is being mined, and, according to the management's plans, a regular shipping schedule is to be inaugurated. Early dividends are certainly a logical expectation under these conditions.

"The stock of the General Mining, Milling & Power Company, listed in San Francisco and on the Spokane Stock Exchange, is in very strong demand, having a very large distribution. I want to call your attention to the fact that this security is fully paid, nonassessable, and carries full voting power,— very important features that must impress you.

"L. F. Pearson & Company—in fact, all of us who are associated with the sponsorship of General Mining, Milling & Power stock, feel that in recommending this issue to our customers, we are rendering real service. It's the best looking deal I have ever come across, and I'm sure that coming months will bear me out in all I have said and will say regarding the stock and its possibilities.

"General Mining, Milling & Power stock has been steadily advancing since its listing, to the present price of———. It is my opinion that this security will be selling, before very long, at $3.00 a share, or perhaps more.

"This is not an issue that will appeal to market scalpers. The character of the man-agement assures real action at the mine. The natural sequence would be market activity which will reflect in dollars and cents the management's experience, energy and ability, and the mine's actual and intrinsic merit. However, profit on General Mining, Milling & Power stock cannot be obtained in 24 hours, but only when and as production increases, giving added value to the stock. Therefore, after buying General Mining, Milling & Power, don't expect miracles. Be loyal to your company by supporting the management in the carrying out of development plans which are designed to enable shareholders to make money by holding for greatly enhanced values, and dividends, which I believe are sure to come.

"The progress of the General Mining, Milling & Power Company is impressive. It is already at a stage which generally requires years to achieve. In other words, it is not a prospect, nor a promotion. The million and one-half tons of ore blocked out, and the hundreds of thousands of tons of rich unworked tailings, are, in our opinion, sufficient to convince you of the stability of the project.

"Two water power grants on White Water Creek are in themselves, we believe, of tremendous value. The development of this hydro-electric power will be a source of additional large profits to the General Mining, Milling & Power Company.

"The expensive equipment now on the properties is fully detailed in the prospectus. Assays which are on file at this office disclose values from $23.06 per ton to $131.52 per ton. The results, however great they may be, are only for those who become actively identified with the enterprise. You, I feel sure, will be one of those.

"Your General Mining, Milling & Power account is going to have my personal attention, I'm going to keep it right here before me, on my desk, so that I can give you the best of service, and handle correspondence myself, instead of turning it over to the Trading Department. For I realize that if I make you a substantial profit on your General Mining, Milling & Power transactions, you will be a regular customer of this firm, and that is what I am after.

"L. F. Pearson & Company, and all the other brokers who are sponsoring General Mining, Milling & Power stock are creating a very large demand for this security, and naturally the price should advance very rapidly.

"Your order will be executed at market through the Stock Exchange. The stock can

be bought in lots of 100 shares and upwards. The commission is $2.50 per 100 shares.

"I feel that General Mining, Milling & Power at $3.00 would be cheap, but I'd rather see you buy at the present market, because the difference between what you pay now, and what you will most likely have to pay if you wait, would in itself be a profit well worth having.· At this point—take my advice—don't hesitate—wire me your order at once.

"I'm determined to do all in my power to make you some money. So take my advice, and follow me through and I feel sure you will have good reason to be glad you did.

"Very truly yours,

"Manager, L. F. Pearson & Company."

"L. F. Pearson & Company take pleasure in announcing that after a careful and thorough investigation covering a period of several months analyzing companies of various kinds we are now in a position to make a most attractive investment offer.

"This offer will appeal to you as being distinctly different from any other proposition in that the company is an operating concern, and its properties have a past production record of $7,500,000. 1,500,000 tons of ore are now blocked out, and upon most conservative assay we are advised that this ore has a value of almost five (5) times the capitalization of the company earnings conservatively estimated based on present operations, and ore blocked out warrant very substantial early dividends.

"The purchase of stock of the General Mining, Milling & Power Company gives you an opportunity to become identified with an operating, mining and milling company, with vast holdings of water power capable of developing twenty thousand (20,000) horse power, that has taken considerable time and money to develop. The character and calibre of the company's management is such that successful,· economical operation is a foregone conclusion. The management is made up of men who have made an outstanding success for over fifty (50) years, nationally known and rated the highest credit. These men constitute the management of John Simmons Company, 110 Center street, New York City.

"L. F. Pearson & Company feel particularly proud of the fact that it is to participate in the distribution of an issue of such outstanding merit, and looks upon this distribution as an opportunity to make hundreds of friends among those who will welcome an opportunity to become interested in a stock which, within a comparatively short time, should enhance greatly in value. This stock is listed in San Francisco and on the Spokane Stock Exchange.

"A comprehensive booklet, containing a full description of the properties embraced in the holdings, excerpts from state and U. S. Government reports, maps and other interesting details, is now being prepared.

"Inasmuch as the current edition of the descriptive booklet will be small, it is suggested that you fill out and return the enclosed card at once, providing you want a chance to go over the details of an exceptional and very unusual security. Your sending for the booklet implies no obligation whatever.

"Respectfully,

"L. F. Pearson & Company,

"Dexter Horton Building,

"Seattle, Washington.

"November 21, 1928."

Without further discussion of the evidence it is sufficient to say that there was ample evidence to go to the jury upon the question of the guilty participation of the appellants in the conspiracy alleged in the indictment. In this connection it should be stated that the account books of the three organizations were introduced in evidence and brought here as exhibits. Defendants objected to an expert testifying with relation to the facts shown by these books, upon the ground that the books were the best evidence. The objection was sustained, although, under the well-established rule, such evidence was proper. Lewis v. U. S. (C. C. A.) 38 F.(2d) 406. In view of the fact that these books are presented without any effort to summarize their contents, without the advantage of expert testimony concerning them, we might well decline to consider a claim of the insufficiency of the evidence on appeal, for the burden on appeal is on the appellant to show the insufficiency of the evidence to justify the verdict. It is true that this court, in the exercise of its appellate power, might submit such books to experts. Such a course is unusual, and, in view of the presumptions against the appellants, entirely unnecessary. We do not base our conclusion, however, upon this presumption, but upon affirmative evidence called to our attention by the parties.

Appellants objected to the sufficiency of the indictment and presented their objection to the trial court on motion in arrest of judgment and assigned the denial of that motion as error. Neither the appellant nor the ap-

pellee seemed to have any difficulty on appeal in stating the purport of the indictment. In the briefs of both appellants and appellee it is stated that the gist of the indictment is a manipulation of stock prices on the San Francisco and Spokane Stock Exchange, and the circulation of false reports through the mails concerning fictitious and fraudulent stock transactions, and to this appellee adds the statement that part of the fraudulent scheme was to fail to deliver the stock purchased by the investors and the conversion of the proceeds therefrom. It is sufficient upon a motion in arrest of judgment if the indictment substantially states the elements of the crime charged. Cyc. of Fed. Proc., § 2433; Banta v. U. S. (C. C. A.) 12 F.(2d) 765; Gibson v. U. S. (C. C. A.) 31 F.(2d) 19.

The indictment covers twenty-two pages of the transcript and appellants' analysis thereof thirteen pages of their brief. In view of the substantial agreement between the parties as to the nature of the offense charged, we need only say that the indictment is clearly sufficient to charge a crime.

■■ Appellants assign as error the ruling of the trial court admitting a letter written by defendant Levy to Richard Sheffield on June 28, 1928. As this evidence was clearly admissible as to defendant Levy, the objection of appellants to its introduction, on the ground that the evidence was incompetent and in no way connected with the issues, was properly overruled. If the appellants desired to limit the effect of this evidence to defendant Levy, they should have requested an instruction to that effect. Robinson v. U. S. (C. C. A.) 33 F.(2d) 238.

■ The government offered the testimony of N. H. Seil for the purpose of showing a telephonic conversation between N. H. Seil, who is a broker in Seattle, with defendant Heath, who was acquitted, in which the witness stated to Heath that he would not handle transactions of that kind through his office, that is to say, a transaction for the purchase and sale of the same amount of stock of the corporation on the same day. The question was not objected to, and for that reason the motion to strike out was properly denied. Moreover, the evidence is clearly admissible against the defendant Heath.

The witness Epstein, the president of the San Francisco Mining Exchange, was called in the first instance by the government, to identify lists of the reported sales of the San Francisco Mining Exchange in the months of October and December, 1928, and January, 1929. He was recalled by the defendants and testified that there was nothing in the rules of the San Francisco Exchange to prevent a broker giving an order to another broker to sell certain stock and approximately at the same time give another order to another broker to buy the same stock, and that this is the usual and customary procedure. In rebuttal, John Swenson testified for the government that Mr. Epstein had told him on April 21, 1930: "That if as president of the San Francisco Exchange, he knew one broker sold certain stock through another broker and immediately after said sale procured a third broker to repurchase it, the practice would not be permitted." The evidence of witness Epstein for the defense was directed principally to the question of operations of defendant Forsyth in San Francisco. It was, however, offered in behalf of all the defendants. If the rules of the stock exchange were as Epstein testified them to be, it would not in any wise alter the guilt of the appellants, who had originated and co-operated in the scheme of misrepresenting to the public the market value and salability of the mining stock in question. A wash sale, whether or not it was permitted by the rules of the exchange, would, under the circumstances disclosed by the evidence, be equally effective to carry out the scheme of the defendants. Its only possible relevancy would be to sustain the contention of defendant Forsyth that he was acting in the usual and customary way. Forsyth was acquitted.

■ The bill of exceptions, which is in narrative form, makes it uncertain as to whether or not the objection to Swenson's testimony was interposed before the testimony was given. The government contends that the objection was made after the testimony was adduced in that regard. In case of doubt the record would have to be construed favorably to the ruling of the trial court and thus to sustain the judgment, but we find no assignment of error based on this ruling, and, in the absence of such assignment, the ruling cannot be considered by us.

Frank Hammond, a witness called for the defense, testified that, as receiver for the West Coast Finance Company, a certain book which is marked Defendants' Exhibit A–43 had come into his possession. He testified: "This exhibit is a securities guide of stocks used for trading on the New York Produce Exchange." The court refused to admit this book in evidence, on the ground it was incompetent. Thereupon appellants "offered to show by the book rejected that the stock of

the General Mining, Milling & Power Company was listed on the New York Produce Exchange during the year 1929, and that there was a market there during the year 1929 for the sale of stock of the mining company and that that condition continued throughout the year 1929 and through the early part of the year 1930. This offer of proof by the said defendants was rejected by the court and an exception allowed and entered in favor of the defendants Harris and Morris to the ruling." The book in question has not been forwarded to this court with the exhibits. The offer does not disclose the alleged market prices, nor is it clear from the record just why the evidence was rejected. The appellants rely upon the rule stated by the Supreme Court in Virginia v. West Virginia, 238 U. S. 202, 212, 35 S. Ct. 795, 800, 59 L. Ed. 1272, as follows: "It is unquestioned that, in proving the fact of market value, accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence. Cliquot's Champagne, 3 Wall. 114, 141, 18 L. Ed. 116, 120; Fennerstein's Champagne, 3 Wall. 145, 18 L. Ed. 121; Chaffee v. U. S., 18 Wall. 516, 542, 21 L. Ed. 908, 912; Sisson v. Cleveland & Toledo Ry., 14 Mich. 489, 90 Am. Dec. 252; Cleveland & Toledo Ry. v. Perkins, 17 Mich. 296; Whitney v. Thacher, 117 Mass. 523; Fairley v. Smith, 87 N. C. 367, 42 Am. Rep. 522; Moseley v. Johnson, 144 N. C. 257, 56 S. E. 922, 929; Nash v. Classen, 163 Ill. 409, 45 N. E. 276; Washington Ice Co. v. Webster, 68 Me. 449; Harrison v. Glover, 72 N. Y. 451. We need not stop to review the decisions that are cited with respect to the extent of the preliminary showing of authenticity that is required (Whelan v. Lynch, 60 N. Y. 469, 19 Am. Rep. 202; Norfolk & W. R. Co. v. Reeves, 97 Va. 284, 33 S. E. 606; Fairley v. Smith, supra). * * * "

The first question presented is whether or not the above statement of the witness is sufficient foundation for admitting the guide book. In Whelan v. Lynch, 60 N. Y. 474, 19 Am. Rep. 202, dealing with the admissibility of shipping and price current list, cited by the Supreme Court, as above stated, and also referred to by Wigmore in his work on Evidence, vol. 3, § 1703, it was said: "The court was also in error, I think, in admitting the Shipping and Price Current List as evidence of the value of the wool, without some proof showing how or in what manner it was made up; where the information it contained was obtained, or whether the quotations of

prices made were derived from actual sales, or otherwise. It is not plain how a newspaper, containing the price current of merchandise, of itself, and aside from any explanation as to the authority from which it was obtained, can be made legitimate evidence of the facts stated. The accuracy and correctness of such publications depend entirely upon the sources from which the information is derived."

We would probably be justified in holding that without more substantial evidence as to the authenticity and reliability of the publication offered in evidence it was properly excluded, but in this case there was a much more cogent reason for excluding it. It appears from the evidence that the defendants were in a position to control the entire issue of stock of the company, defendant Levy having an option upon a million shares and an agreement that the balance would be neither issued nor registered. It is obvious that during the period covered by the conspiracy there could be no market value thereof in New York City, regardless of the entries which might have appeared in the excluded book. Moreover, it appears from the evidence that the defendants were prepared to carry on in New York a similar campaign to affect the reports of the New York Stock Exchange. The telegram from the appellants signed L. F. Pearson & Co., directed to E. O. Fitzpatrick, president of the West Coast Finance Company, at Port Angelus, Washington, states: "Eastern pool operations on general now strongly organized. Will undoubtedly commence operations immediately after the first of the year. Should undoubtedly result in substantial appreciation of market prices; therefore advise that you be prepared to benefit through this information."

In view of the proof before the court with reference to the utter unreliability of the reports of the Spokane Mining Exchange and the San Francisco Mining Exchange as showing market value of stock of this corporation, it is manifest that, without further proof than the general statement that a book found in the custody of the defendants was a securities guide of stocks used for trading on the New York Produce Exchange, there is an insufficient foundation for the admission thereof, as it also appeared from the evidence that the intrinsic value of the property owned by the mining company did not exceed 7 cents per share, and there is no showing of any change in value during the continuance of the conspiracy. The appellee supports the ruling of the trial court in excluding this evidence

by claiming that the conspiracy terminated on January 14th and erroneously asserting that the offer did not cover the whole of the year of 1929, but the foregoing quotation shows the offer covered the entire year of 1929. The appellee also contends that the market value of the stock in 1929 is immaterial, for the reason that the conspiracy charged is not based upon actual loss suffered by those defrauded by reason of the fact that the property was worth less than they paid for it, but on the proposition that the scheme was designed to obtain money from investors which they would not part with except for the fictitious values established on the Spokane and San Francisco Stock Exchanges, and misrepresentations made in connection therewith. In view of the showing of the government, however, that the mining properties were of so little value, as disclosed by its witnesses, it would undoubtedly be proper for the defendants in rebuttal to show that the property itself was more valuable than claimed by the government's witnesses. The showing of market quotations of stock in New York, however, would not rebut the evidence offered by the government with relation to the actual and intrinsic value of the stock, and furthermore, as we have said, the publication was properly rejected because, under the circumstances disclosed by this case, no proper foundation was laid for the admission of the book offered by the defendants to prove the market value of the stock.

▇▇ Appellants offered to prove that John A. Swenson, post office inspector assigned to investigate charges against the defendants, had on October 23, 1929, long after the filing of the indictment in this case (March 27, 1929), written a letter to W. A. Cochran, president of the company, stating that it was hoped that the case against the defendants could be brought to trial soon after the first of the year 1930, and that he would be glad to have the company withhold any steps for a general sales campaign until that time, "since the defendants in the case are going to take as great a comfort as they can out of anything done by you." Defendants offered to prove by the witness that the purpose of the letter was to have the stock "redrawn" (withdrawn) from the market, to the end that it would appear that it had no market value, and that, because of the action of the government agents, the market for this stock was deliberately destroyed. The offer to prove was elaborated by the additional offer, "and that as result of said letter the market for the disposition of this stock was destroyed by

the action of the Government itself." If the defendants had desired to present to the jury these alleged activities of this witness, it could have been done on his cross-examination, when he testified for the government, to show his interest in the case. This was not done. Proof that the market value of the stock had been destroyed by the witness long after the indictment would not tend to prove that the defendants were not guilty of the conspiracy to obtain money by false pretenses, which was fully accomplished before the indictment in March, 1929. It is doubtful if the offer should be construed to be any broader than an offer of the letter itself, for certainly the offer to show that as result of the letter the market had been destroyed would be an offer to prove a mere conclusion. However that may be, the objection to the offer was properly sustained.

Appellants present forty-nine assignments of error with relation to the instructions to the jury given and refused by the trial court. It is first claimed that the entire charge was argumentative, misleading, and discriminatory. The charge covers thirty pages of the transcript. We have read this charge with care, and in its entirety it is eminently fair. The jury were carefully instructed that they were the sole judges of the facts, that the court intended to refrain from expressing an opinion on the facts, and that, if in the course of the instructions it did so, such opinion was not binding on the jury. Throughout the instructions, the court, after informing the jury that the good faith of the defendants was a vital question in the case, couched his instructions in the form of questions. The apparent purpose of these questions was to call the attention of the jury to certain factors in the case without intimating to the jury the view of the court as to the effect of the answer to the question. One quotation will illustrate the nature of the questions: "Did they cause reported sales on the Spokane Stock Exchange for block of stock or cause to be split up in smaller denominations and listed in the literature sent out for the purpose of showing an increased number of investors?"

Now, it was admitted by the defendants that they had done exactly the thing which the court asked the jury to consider, as hereinbefore stated. The court would have been justified in stating directly to the jury that in his opinion the evidence showed that they did what in fact they admitted that they did do. At the conclusion of twelve of these questions the court said: "These are matters

for your consideration and upon which you must conclude to determine the plan or scheme under which the defendants operated and the intent, purpose and motive prompting it." It is clear from this conclusion that the answer to these questions was left entirely to the jury. Thereafter three other questions were asked. These were directed especially to the question of the guilt of the defendant Levy.

■ There was no assignment of error based upon the claim that the instructions were argumentative or misleading or discriminatory. While an objection to the instructions upon the ground that as a whole they were argumentative may be considered without an assignment of error, this case does not present a situation where the court would be either justified or required to consider the question without an assignment of error. However, as we have said, the instructions were, as a whole, fair.

■ Assignments 8 to 29 are argued together under the heading "Numerous erroneous instructions were given by the court and certain requested instructions were erroneously refused." Assignment No. 29 is based upon the refusal of the court to give the following instruction: "I instruct you that no defendant can be guilty of making a false and fraudulent representation because he expresses an opinion. The expression of an opinion can never be a false and fraudulent representation. A defendant who represented that it was a good investment; a defendant who represented that in his opinion the stock would increase in value; a defendant who represented that it would become a profitable investment, is either expressing an opinion or is making a statement of a future event, and in neither instance is he guilty of making a false pretense or a false representation." This instruction was properly refused. It does not state the law correctly. If the defendants in this case stated that stock worth 7 cents was a good investment at $2.30, and they knew at the time the statement was made that the stock was not worth more than 7 cents, the representation is clearly fraudulent under the circumstances of this case, where the buyers have no independent knowledge of any of the facts with relation to the distant mine. Sacramento Suburban Fruit Lands Co. v. Nelson (C. C. A.) 36 F.(2d) 929; Sacramento, etc., v. Melin (C. C. A.) 36 F.(2d) 907. The court gave an instruction upon this subject which the appellants complain of in their brief. We find no exception to the giving of this instruction nor any assignment of error based upon the giving of the instruction, and the instruction was more favorable to the appellants than they were entitled to, for in conformity with the request of the appellants the jury were instructed that expressions of opinions were not false and fraudulent representations.

Assignments of error as to instructions given, Nos. XII, XIII, XIV, XVI, XX, and XXVI, are argued together. Appellants say: "The instructions seem to rest the guilt of the defendants upon the reporting and circularizing of sales 'at advancing prices' when advances in prices were caused and 'inspired' by the defendants themselves rather than by any 'new discoveries in the mines' or 'added intrinsic value to the stock'. The court paid no heed whatsoever to the fact that a representation of advancing prices is a representation of advancing prices and nothing more nor less." This indicates the general line of the argument of the appellants directed against the instructions given.

■ It is difficult to epitomize the instructions thus objected to. Their general purport is that a mere belief on the part of the defendants in their power to arbitrarily advance stock market quotations was not sufficient to establish good faith where the purpose was to arbitrarily advance such market values without reference to any increase in the intrinsic value of the stock. We see no objection to this instruction. It amounted to little more than informing the jury that appellants' belief in their ability to successfully defraud the public was not a defense to the charge of conspiring to obtain money under false pretenses.

■ Assignment of error XXIV to an instruction give by the court on the subject of intent is not well taken. The instruction was proper. Agnew v. U. S., 165 U. S. 36, 53, 17 S. Ct. 235, 41 L. Ed. 624. The gist of the instruction was that the jury might infer a man's intent from his acts.

■ Assignment of error No. XXV deals with the interrelation of the five counts of the indictment charging mail frauds with the sixth count charging a conspiracy to violate section 215 of the Penal Code (18 USCA § 338). The gist of the instruction to the jury was that, if it found that a conspiracy existed as specifically charged in count 6, and if such conspiracy involved a plan or scheme to defraud, and if the conspirators used the mails in carrying out the conspiracy, those joining in the conspiracy would be guilty of the overt

acts by coconspirators in pursuance thereof, whether or not they immediately participated therein. Appellants' claim of error is thus stated: "Thus the court practically directed the jury to find the defendants guilty on 'one or all' of the substantive counts if they found them guilty of the conspiracy."

We think this criticism is not justified. It is fundamental in the law of conspiracy that, when the conspiracy is shown to exist, all conspirators are responsible for the acts of their coconspirators in carrying out the conspiracy. Belden v. U. S. (C. C. A.) 223 F. 726; Robinson v. U. S. (C. C. A.) 33 F.(2d) 238. Moreover, appellants testified that they engaged in a mailing campaign and themselves committed the various overt acts charged.

In the instructions to the jury the court called attention to the argument, which is not set out in the record, to the effect that the parties were operating under a pool which was legal. The court correctly instructed the jury that there was no evidence of any pool formed by the defendants with the purchasers of stock.

The appellants seek to take advantage of certain instructions or statements by the court in its charge to the jury which related specifically to the conduct of the defendant Levy, who is not appealing. The court asked the jury to consider whether or not the plan conceived by Levy in the organization of the Pulp & Paper Securities Company and the West Coast Finance Company and the securing of local persons as trustees "was a scheme to camouflage the public and lull investors into a feeling of security because of the reputation of local men, or was his plan at its inception bona fide, and, if so, why was the stock placed on the Spokane and San Francisco Exchanges and not on the Seattle Exchange, where the offices were located and it is shown an exchange was operated—or, was his purpose to have distance lend enchantment?"

The attention of the court was called to the instruction by the exceptions to the charge in which it was claimed that there "was no evidence that there was any mining exchange in Seattle or any testimony that there was any exchange on which mining stock could be listed outside the city of San Francisco and Spokane." Appellant Morris, on his cross-examination, had testified that the stock "was not listed on the Seattle Ex-

change so that no sales could be made here except privately." It was a reasonable inference from this testimony that that stock could have been listed on the Seattle Exchange if parties had desired. The court, however, accepted counsel's statement made in the exception and withdrew that portion of the charge and instructed the jury to disregard it. Even if there was any error in giving the instruction, it was cured by its prompt withdrawal.

In the charge to the jury the following passage occurs to which appellants object: "If Levy was acting in good faith, why did he dictate letters on important matters and have Helma Campbell, his stenographer, sign instead of signing them himself? Why did he dictate a letter March 26th, 1928, and send advertising matter to 'The Star', Toronto, Canada, offering a block of Pulp & Paper Securities at attractive prices in the name of his stenographer, Miss Kennedy, and direct her to simulate a male handwriting?"

The exception to this instruction by defendant Levy, and concurred in by the appellants, is as follows: "Mr. Dore: In calling the attention of the jury to why Levy dictated letters and did not sign them himself, having them signed by Helma Campbell—why the letter that went to the newspaper in Canada was signed with a simulated handwriting of a girl or lady stenographer in the office."

It will be observed that in the exception it is not claimed that the implied statement of the court was not borne out by the evidence, namely, that defendant Levy had his stenographer sign important matters instead of signing them himself, and had her offer stock of the Pulp & Paper Securities Company in her own name, signed in simulated handwriting. We may therefore assume that the ground of the exception indicated by the court was the mere fact that the court had called attention in this manner to such evidence. In view of the fact that the court left all questions of fact wholly to the determination of the jury, and that the comment of the court was justified by the evidence, we cannot say that the instruction was either erroneous or prejudicial as to the appellants. The most that can be said of the instruction is that the court felt that the methods of defendant Levy shown by the evidence in regard to the matter in question were worthy of the attention of the jury in arriving at its verdict.

Judgment affirmed.